THE RUTH CONWAY.

THE HUSTLER.

THE BARGE NO. 110.

Nos. 2869, 2907, 2923.

District Court, D. Maryland.
Oct. 14, 1947.

516

George W. P. Whip, of Baltimore, Md., for Luke R. Parker.

John H. Skeen and John H. Skeen, Jr., both of Baltimore, Md., for The Hustler, and others.

Theodore R. Dankmeyer, of Baltimore, Md., for Swift & Co.

COLEMAN, District Judge.

This proceeding involves a collision which occurred about midnight on October 30, 1946, near the south bank of the Chesapeake & Delaware Canal, approximately a mile east of the railroad bridge across the canal some five miles east of Chesapeake City, Maryland, between the Ruth Conway, a motor vessel fully loaded with fertilizer, and the Barge No. 110, which was being towed by the Tug Hustler.

The Ruth Conway was approximately 107 feet long, 25 feet beam, and with a draft of six feet. The tug was approximately 66 feet long, 16 feet beam, and 8 feet extreme draft, and the barge approximately 99 feet long, 24½ feet beam, and 7 feet draft. As a result of the collision, both the Ruth Conway and her cargo were a total loss. Swift & Company, owner of the cargo, appears as claimant to recover for its loss.

The barge was being towed on the starboard side of the tug, which was in compliance with the then existing regulations promulgated by the Secretary of War for operation of vessels through the Chesapeake & Delaware Canal. Also, according to one of those regulations, the Ruth Conway had the right of way because proceeding with the current. So much of that regulation (No. 11) as is pertinent here, reads as follows: "All vessels proceeding with the current shall have the right of way over those proceeding against the current." However, that regulation is not to be construed as taking precedence over, or modifying Article 25 of the Inland Rules, 33 U.S.C.A. § 210, known as the narrow channel rule, which requires steam vessels, when it is safe and practicable, to keep to their own right-hand side when proceeding through narrow channels. This canal is a body of water to which that rule is applicable; and it has been so held in The Montrose, 3 Cir., 152 F.2d 924. The most weight, however, that should be attributed to this canal regulation, to the advantage of the Ruth Conway, is that it imposed upon vessels breasting the tide the duty to use a high degree of care with respect to vessels moving with the tide. It was testified in the present case that at or about the time of the collision there was a heavy tide in the canal,—about six miles an hour,—aggravated, presumably, by curves, one near the railroad bridge, and another about two miles farther east.

At the outset, it is appropriate to allude to certain factors that are usually involved in a case of this kind, and to state whether or not they have any bearing upon the question of liability. Among these are weather and visibility, which were not material factors in the case, as the testimony discloses; that is to say, there was no unusual weather condition that could have had a material effect, one way or the other. Visibility was normal and there was no appreciable wind.

There is some evidence that the barge was not properly lighted; but we believe this evidence to be inconclusive. There is no evidence that the tug was not properly equipped as to lights; and the evidence is to the effect that the Ruth Conway had the required lights burning.

As to personnel, that is, as to the question of the seaworthiness of the three vessels involved, from the point of view of whether or not they were properly manned, there is an unfortunate gap in the testimony which makes it somewhat difficult to

determine just what the exact facts were, in that there is no testimony from the master of the Ruth Conway, he being deceased. There is testimony to the effect that he did not have a license to navigate in these waters, although he had other similar licenses; had had long experience in navigation and a reputation as a careful, successful navigator. Also, there is further testimony that his employment as master, without the particular, specific license, was due to a misunderstanding, an inadvertent error on both his own and libellant's part, based on the assumption that he did have the required license. In view of the conclusion which we reach with respect to liability, and which we are about to explain, we feel that this failure on the part of the Ruth Conway's master to have the necessary license, was not a factor that in any sense contributed to the collision.

We come then to a consideration of the material facts in the case with respect to the two questions that are raised: first, which, if any, of the vessels was liable for the collision, or were both the Ruth Conway and the tug liable, or were all three, the Ruth Conway, the tug and the barge, liable? Then, secondly, if the tug or the barge, or both, were liable, has the owner of these vessels nevertheless sustained the burden that rests upon him, by virtue of its petition for limitation of liability, of showing that liability should be limited to the value of the tug?

Taking up the first question, that is, as to which, if any, of the vessels were at fault in navigation, we reach the conclusion, without any real difficulty, from the weight of the credible evidence, that we have here a case where those in charge of the tug failed to comply with the basic rule when navigating in a narrow body of water, such as was the Chesapeake & Delaware Canal at this point. From the admitted location of the collision, reference to the Government chart in evidence shows that the navigable width of the canal at this point was a little less than 100 yards. It widens out and narrows again in various places, from the railroad bridge east for some two miles; but it is a narrow waterway. Therefore, there was an obligation on both vessels to obey the narrow channel rule, and to keep well over to their own right-hand side. We find from the weight of the credible evidence that the tug, with the barge in tow alongside, was not complying with this rule at the time the tug first sighted the Ruth Conway. It is possible from the evidence, or from certain parts of the evidence, to make either one of two deductions: (1) that the tug, for some time prior to the collision, had been keeping well over to her right, that is, the north bank of the canal; or (2) that the tug had not been so proceeding but had been moving too far to her port side, and over the center of the channel. However, the testimony of Captain Smith himself, the master of the tug, is tantamount to an admission,—although he does not say this in so many words,—that he was too far to the left of where he ought to have been when he first saw the Ruth Conway, that is, her green light. But, in addition to that fault which we find to have existed, from the weight of the credible evidence, there was an even more primary fault committed and admitted by Captain Smith himself, that is to say, at no time did he sound the danger signal. This we believe to be the crux of the case.

There is a conflict in the testimony as to just what blasts were sounded. Captain Smith's testimony and that of his mate were not in complete harmony. He says he gave a two-blast signal, meaning that he wanted to make a green, a starboard-to-starboard passing, since he believed, as he said, in effect,—not quoting his exact words—that this was the only thing he could do under the circumstances, because he thought the Ruth Conway was proceeding too far to the north side of the canal to let him do anything else. He said that, after giving two blasts, he did not hear a reply, and that thereupon he gave a three-blast signal, indicating that he was going full speed astern, and that he did give the order to this effect to the engine room. His mate, however, said that there was a cross-signal reply of one blast.

There is other testimony, on behalf of the Ruth Conway, that she gave a one-blast signal and that it was answered and

then not followed. However, it is not necessary to resolve this conflict in the testimony with respect to the giving and answering of passing signals, or to decide which part of it is to be accepted as true, which part is to be rejected as false. Also, we may ignore, for obvious reasons of probable bias or animosity, the testimony adduced by the libellant through the tankerman Doty, who was on the barge in the capacity of bargemaster. We need not dwell on this testimony because, as already explained, of the admission by the master of the tug that he was not, in fact, keeping to his own starboard hand, and that he did not give any danger signal, which he was obligated to do, if we assume (but we do not so decide) that it was not safe or practicable for him to keep to his own starboard hand. This failure on the part of the tug was the proximate cause, and we believe the sole proximate cause, of the collision. For the tug to signal that she was reversing her engine, and for her to have done so, was not sufficient. Her master admits that he tried to determine what the Ruth Conway was going to do, before he even gave the astern signal. It was his absolute duty, as soon as he had any doubt about what the Ruth Conway intended to do, to sound the danger signal. It was further his duty, even though he did not have any such doubt, but assumed from her then location, that the Ruth Conway was trying to adhere to a course that would require a passing different from a port-to-port passing as called for by the narrow channel rule, to have sounded the danger signal, to have stopped, waited, and tried to maintain his part of the requirement with respect to passing in a narrow channel. He testified that he maintained full speed ahead until he ordered full speed astern.

We conclude that the master of the tug Hustler failed in his duty, because he found himself in a predicament due to the position which he ought not to have assumed with his tug, namely, she was too far to the south of the center of the channel, or at least too far from the north bank, even if she was still north of the center line of the channel, and, by his own testimony, he was having difficulty in breasting the current and it became impracticable for him to attempt to make a red-to-red, i.e., a port-to-port passing.

There might be situations, in a narrow waterway of this kind, which would permit departure from the standard rule—in fact, not only permit, but require it, in order to avoid a collision, as, for example, on an unusual curve, or in the face of some untoward circumstance, that was not reasonably to have been anticipated. But here the weight of the credible evidence does not indicate that the curves in the canal really played any part in the collision, except they caused the tide to flow more swiftly. In short, we are satisfied that there was faulty navigation that was obvious and inexcusable on the part of the tug in the vital respects just explained, and that there has been shown no fault on the part of the Ruth Conway that contributed to the collision. Therefore, we find no liability on her part. It was said in the case of The Victory, (The Plymothian), 168 U. S. 410, at page 423, 18 S.Ct. 149, 155, 42 L.Ed. 519: "As between these vessels, the fault of the Victory being obvious and inexcusable, the evidence to establish fault on the part of the Plymothian must be clear and convincing, in order to make a case for apportionment. The burden of proof is upon each vessel to establish fault on the part of the other." We consider that the situation in the present case is similar.

There are some additional and very material points which should be emphasized, namely, the location of the Ruth Conway when she foundered, and the location, and the character and extent of the injury which she suffered. A great hole was driven in her port bow, extending well below the water line, as well as above. As a result, she sank soon after her crew was taken off by the tug. Photographs placed in evidence show that she sank somewhat athwart the canal, but with her nose well into the southern bank. These circumstances clearly indicate that the collision must have occurred when the Ruth Conway was at least reasonably near to the position that the law required her to assume, when she was struck, that is, well over to the south side of the channel.

■ We come, then, to the next and last question, which is this, having decided that the tug was solely at fault: have her owners, nevertheless, made out a case for limiting their liability to the value of the tug?

As this Court said a number of years ago in the case of The Calvert, 37 F.2d 355, at page 363, "The word 'privity' of the owner, as used in the [limitation of liability] statute, means some fault or neglect in which the owner personally participates. The word 'knowledge,' as used, means some personal cognizance, or means of knowledge, of which the owner is bound to avail himself, of a contemplated loss, or of a condition of things likely to produce or contribute to a loss, without adopting appropriate means to prevent it." That rule has been announced in so many decisions, before and since, that we feel reference to them is not necessary.

■ What, then, does the evidence in this case show on this point? Counsel for libellant maintains that limitation should not apply because there was that privity which the statute refers to, for two reasons: first, because the tug Hustler has been proved by the testimony not to have been equipped with an engine of sufficient horsepower to do the job of safely taking a barge of this size through the narrow Chesapeake & Delaware Canal,—of facing, in the night time, existing conditions of tide and meeting other vessels; and that the facts, as developed in the testimony, indicate that the owners, even if they did not actually know, should have known, and, therefore, are charged with the duty of knowing that a more powerful tug was the only appropriate one to use for safe navigation under the circumstances.

Counsel for libellant emphasizes the testimony of Captain Cullison, of Baltimore, a tugboat captain employed by the Curtis Bay Towing Company, a large, long-established and reputable local company. He testified that for safe navigation, under the particular circumstances, a tug of not less than 400 horsepower was necessary, whereas it is admitted in this case that the horsepower of the tug Hustler was not in excess of 210.

Also, it is asserted on behalf of libellant that the tug was manned by incompetent personnel. Even though it is true,—and the Court cannot fail to express great surprise that it is true,—that Diesel engine tugs in this kind of service are not required by any law or regulation to have a licensed master, nevertheless, as libellant's counsel we think correctly maintains, if such a tug does not have a licensed master in command of her, a heavier burden rests upon her owner when faced with a situation such as the facts in this case disclose.

■ We are not unmindful of the fact that this same tug and tugs of a similar type, with similar personnel, and towing barges of a similar type and with similar cargo, have gone successfully through this canal. But this is not conclusive in the present case.

We feel that the petition for limitation must fail largely upon the testimony of Captain Smith himself, plus the testimony of the engineer on the Ruth Conway. Captain Smith, while testifying, gave the Court the impression that, while an honest man, he was grossly lacking in knowledge of the Inland Rules of Navigation. Cases of this kind must be decided, not by extraneous knowledge, or inferences, but by what the witnesses, who are heard and seen by the Court, say and the impressions that they make upon the Court.

To sum up his testimony in relation to this last phase of the case, namely, the question of limitation of liability, Captain Smith, in effect, said that he found himself in a jam, and could not navigate his tug and tow any nearer to the north bank of the canal, so he did not think there was anything else for him to do but to sound a three-blast signal and reverse his engine. That, as already herein fully explained, shows incompetency with respect to navigation, which is not overcome by anything else in any of the testimony.

■ The question then is: is the knowledge of this incompetency on the part of the master of the tug to be imputed to his employer, the respondent company? A point already referred to is stressed, on behalf of the tug's owner, ie., that it was

lawful for a Diesel tug of this type to be navigated by persons not holding any license. However, the fact that the master of the tug Hustler did not have a license explains in part, at least, why he did not have, ready at hand, the knowledge which having such a license presupposes,—knowledge which the law with respect to safe navigation requires that a tug boat master shall always possess and use. Therefore, this serious lack on the part of the master must be imputed to the tug's owner, because the weight of the credible evidence shows that the respondent should have known that (1) the tug's master was not fully competent for the work in hand; and (2) a more powerful tug was required.

The point has been stressed that the license of the master of the Ruth Conway, now deceased and from whom there is no testimony in the case, did not, in fact, embrace the Chesapeake & Delaware Canal; and also that the engineer of the Ruth Conway had no license. But we do not find that these things had any causal connection with the collision. There is no proof that either of these men did not perform their duties satisfactorily.

Part of the testimony of the Ruth Conway's engineer is particularly significant because it supports our conclusion as to the actual cause of the collision. When recalled to the stand, he testified that he heard Smith, the master of the tug, say, after the collision, that "This may cost me my job", and that he would never again take the barge through the canal under like circumstances. While the person who gave this testimony is libellant's son-in-law, he made a very favorable impression as a witness, and no basis has been disclosed for attacking his credibility.

In conclusion, it is believed that the more salient parts of the entire testimony have been analyzed and that the Court has set forth in sufficient detail the reasons why it concludes that the libellant, owner of the Ruth Conway, is entitled to recover from respondent, the Harbor Towing Corporation, for her loss; and that, likewise, why Swift & Company, claimant as owner of the cargo aboard the Ruth Conway, is entitled to recover for its loss from the Harbor Towing Corporation.