The GREATER NEW ORLEANS EX-
PRESSWAY COMMISSION,
Libelant,

v.

The TUG CLARIBEL, Her Engines, etc.
and BARGE TJ–55, Her Tackle, etc.,
Jahncke Service, Inc. and the Home In-
surance Company, Respondents.

In re JAHNCKE SERVICE, INC., Peti-
tioning for Exoneration from, or Lim-
itation of, Liability.

WINN–DIXIE LOUISIANA, INC.,
Plaintiff,

v.

The HOME INSURANCE COMPANY and
American Employers' Insurance
Company, Defendants.

Nos. 4274, 4277; Civ. A. No. 10795,
Division D.

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 30, 1963.

Deutsch, Kerrigan & Stiles, Jack G. Carinhas, Jr., Brunswick G. Deutsch, William S. Stone, Cornelius G. Van Dalen, New Orleans, La., for Jahncke Service, Inc. and The Home Ins. Co.

Lemle & Kelleher, N. B. Barkley, Jr., Charles E. Lugenbuhl, Lancaster, King & LeCorgne, William McM. King, Robert E. LeCorgne, Jr., John T. Pender, New Orleans, La., for The Greater New Orleans Expressway Commission.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Robert B. Acomb, Jr., Donald L. King, New Orleans, La., for Winn-Dixie Louisiana, Inc.

Roger H. Fellom, John T. Mulvehill, New Orleans, La., for Bradford Coleman.

AINSWORTH, District Judge.

These cases involve a determination of a petition in admiralty by Jahncke Service, Inc. for exoneration from, or limitation of, liability and the direct actions for damages by The Greater New Orleans Expressway Commission against petitioner and its insurer, The Home Insurance Company, and by Winn-Dixie Louisiana, Inc. against petitioner's insurer and the Expressway Commission's insurer. The Expressway Commission and Winn-Dixie also filed similar claims in the limitation proceeding. On the day trial of these cases began, Bradford Coleman, driver of Winn-Dixie's truck, filed a claim in the limitation proceeding for damages for personal injuries. Motion to dismiss and for summary judgment was filed by The Home Insurance Company against this late-filed claim, and the court reserved its ruling and proceeded with the trial.

On January 25, 1960, in the early morning, the Jahncke tug CLARIBEL, with tow, was in collision with the Causeway of The Greater New Orleans Expressway. The Causeway is a 24-mile-long concrete bridge spanning the center of Lake Pontchartrain at New Orleans. On the date referred to, the tug CLARIBEL received written orders from Jahncke's administrative assistant to its marine superintendent, to-wit: "WEATHER PERMITTING. Take one big TJ barge to Dredge Maurepas to be loaded with reef (oyster shell). Pick up two loads of reef (Alabama and Florida) and take to Slip No. 4. You are to be available at Slip No. 4 no later than 1 PM Tuesday (January 26)." Accordingly, the empty barge TJ–55 was push-towed by the CLARIBEL from Jahncke Slip No. 4 at 11:15 p. m., headed north through the Industrial Canal at New Orleans, which connects with Lake Pontchartrain, on its way to the dredge MAUREPAS located near the north shore of Lake Pontchartrain via the north drawbridge of the Causeway, a distance of about 20 miles.

The CLARIBEL apparently encountered no fog when it left the mouth of the Canal and entered the Lake, although there was a slight haze over the water at the time. Captain John Carver, master of the CLARIBEL, set a course of 355° and at midnight was relieved by the pilot, D. C. Brister.

The captain instructed the pilot to stop the vessel if he ran into fog and to call

the captain who would assist him in dropping anchor. Weather conditions remained the same until 1:10 a. m., at which time a dense fog was encountered which limited visibility to less than 200 feet. The pilot, Brister, did not stop but reduced speed from 7 m. p. h. full ahead to about 4 m. p. h. About five minutes after reducing speed, the CLARIBEL and its tow rammed a support piling on the Causeway Bridge at a point 12.6 miles from the south shore and 3.4 miles from the north drawbridge, doing extensive damage to it. A truck owned by the claimant, Winn-Dixie, and driven by Bradford Coleman, was damaged and lost some of its freight when two spans of the Causeway collapsed under it as a result of the collision. Coleman claims he was injured at the time. The pilot did not see the Causeway until he struck it.

Petitioner concedes at the outset that it is not entitled to exoneration from liability. It avers that the accident was caused through the sole fault of its pilot, Brister, who continued to navigate in heavy fog despite company policy that he stop when such conditions were encountered.

The first question we must determine is whether the CLARIBEL was unseaworthy. More specifically, was the CLARIBEL unseaworthy because of compass error and was her crew incompetent?

The CLARIBEL's magnetic compass was purchased and installed in 1956. The evidence indicates that it has never since been checked or calibrated, though Jahncke's Marine Superintendent Nunez contends it was checked once. Nunez testified (by deposition because of serious illness) that the CLARIBEL's compass had been repaired in June or July 1959, about six months before the accident; that this was the only time it was ever checked. He said he would produce an invoice showing the repair, but apparently it was never found and it is not in evidence. This testimony has no corroboration in the record and is vague and indefinite so that we place little reliance upon it. Captain Carver

testified, as did Brister, his pilot, that Nunez told them after the accident that the compass had an error of 17° west. Nunez, however, denied their statements to this effect. Carver and Brister contradicted him, saying they were told about the error *after* the accident. Repairs and maintenance have been performed on many parts of the vessel from time to time, all of which have an effect on compass heading, but the compass was not properly checked. There was no regular maintenance practice for upkeep of the vessel or its equipment. Arc welding, which also has a definite effect on the compass of a steel-hulled vessel, had been performed on the tug shortly before the accident but the compass was not checked when the welding was completed. Barges in tow of the tug also can affect the compass. The evidence with regard to extent of error in the compass is not entirely clear and is, therefore, in dispute. Petitioner claims the error was 11° west. Petitioner avers that compass error was immaterial; that the CLARIBEL always made the run on a compass heading of 355°. It states that on subsequent runs 355° was found to be the correct course. Captain Carver testified that after the accident he traveled a 358° course in order to reach the north draw of the Causeway. It is impossible to reconcile these conflicts. Reference to the charts of Lake Pontchartrain in evidence proves beyond doubt that 355° either true or magnetic course is not the proper course to the north draw of the Causeway. The correct course is 342½° true, and 336½° magnetic, and is the heading of a properly calibrated compass on a vessel heading into the Lake through the Industrial Canal, the Canal being in alignment with the north draw of the Causeway.

In our opinion the faulty compass was undoubtedly a primary cause of the collision, without which the accident would not have happened.

The captain and pilot of the CLARIBEL testified they did not know the compass was in error prior to the accident. They said that even had they

known of the error they did not then or now know how to correct or compensate for deviation. These men were responsible for the navigation of this vessel and tow and though they had worked on Lake Pontchartrain for several years, they were completely lacking in ability to use a compass properly. They had never been instructed in the use of the compass; also they were not licensed by the Coast Guard.

On this trip the vessel was short one crew member. There were six men aboard; one of them the captain considered a "green" deckhand. Though in weather of the kind encountered it is necessary that a lookout be posted at the head of the flotilla, none was provided.

To run blind in a dense fog is culpable negligence. Here the pilot was attempting to steer his vessel with a compass which is in error, though he did not then know it, and with no lookout posted to give warning of impending danger.

Petitioner in limitation, Jahncke, contends that the accident would have occurred no matter what course the pilot followed because they state that the cause of the accident was Brister's failure to stop the vessel when visibility was reduced, despite his instructions and company policy that he do so. It is true that failure to stop was a contributing factor to this accident, but the casualty resulted from a combination of causes which we have detailed. Compare Mid-West Towing Co., Inc. v. Anderson, 7 Cir., 1963, 317 F.2d 270. Had the compass been true or had the captain or the pilot been instructed and capable of correcting for error, the accident would not have occurred.

When the CLARIBEL struck the Causeway it was off course 3.4 miles south of the north draw, the point at which it was to cross the Causeway. The most reasonable explanation for such a difference in course was compass error together with lack of knowledge of the crew and inability to correct for deviation, which were proximate causes of the accident. Of course, as we have pointed out before, neither the captain nor the pilot knew of the compass error before the accident. On the north draw the foghorn was in operation and both bridge lights were functioning. The CLARIBEL with this particular tow could have been stopped within 400 feet. Even without a lookout at the head of the tow the foghorn should have given ample warning if the crew had been alert.

■ We must next decide whether there was privity or knowledge of Jahncke sufficient to warrant denial of the limitation petition. Limitation of liability is provided for in Title 46, Section 183(a), U.S.C.A. "The liability of the owner of any vessel, * * * for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not * * * exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." In order for Jahncke to avail itself of this statutory provision it must affirmatively show that the acts of negligence set forth in detail above were done without its privity or knowledge. This turns on the facts of each particular case. Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943).

■ Privity means personal cognizance or participation in the fault or negligence which causes the loss. Continental Ins. Co. v. Sabine Towing Co., 5 Cir., 1941, 117 F.2d 694, certiorari denied Sabine Towing Co. v. Continental Ins. Co., 313 U.S. 588, 61 S.Ct. 1111, 85 L.Ed. 1543 (1941). The term "knowledge," as used in the statute, has been held to mean not only personal cognizance but also the means of knowledge of which a party must avail himself in order to prevent a condition likely to produce or contribute to a loss. The Cleveco, 6 Cir., 1946, 154 F.2d 605.

■■ The marine superintendent for Jahncke was responsible for the maintenance and upkeep of petitioner's vessels and for the hiring and firing of marine personnel. It is well settled that a corporation is chargeable with privity or

knowledge which will defeat limitation of liability when its knowledge is that of one of the managing officers. The Princess Sophia, 9 Cir., 1932, 61 F.2d 339, certiorari denied Brace v. Canadian Pac. Ry. Co., 288 U.S. 604, 53 S.Ct. 396, 77 L.Ed. 980; In re Petition of Henry DuBois' Sons Co., S.D.N.Y., 1960, 189 F. Supp. 400. A marine superintendent is a managing officer whose privity or knowledge is chargeable to the corporation. The Erie Lighter, 108, D.C., N.J., 1918, 250 F. 490.

■ The CLARIBEL's compass was installed in 1956 and until the time of the accident we believe it had never been properly checked. Nunez, the marine superintendent, knew when the compass was installed, about the numerous repairs to the tug and also knew that electric welding had been performed on the vessel. Nevertheless we hold that he failed to have the compass checked from time to time. Checking it for error and calibration would have been a simple task. Vessels navigating in Lake Pontchartrain and the other inland waterways in this area should not be expected to travel without the benefit of a properly calibrated compass even though none is required by specific law. Such vessels operate in wind, rain and fog, day and night. Failure to have a properly working compass on this vessel was negligence and is, therefore, attributable to petitioner in limitation.

The captain and the pilot were not competent to operate with a compass which was in error and make appropriate correction for deviation. These men were not licensed by the Coast Guard, and although a license is not required of inland tug operators, a heavier burden rests on the owner when he is attempting to show that he hired competent personnel. The Ruth Conway, D.C.Md., 1947, 75 F.Supp. 514. Had Carver and Brister been licensed, Jahncke could have relied on this fact. But in the absence of licenses Jahncke should have made some inquiry into the qualifications and abilities of its employees to handle their respective duties. Petitioner has not shown that it has ever made any inquiries into the qualifications of its employees— the proof is to the contrary.

Nunez, the marine superintendent, did not check into the competence of men he hired, and no instructions were given the crew about use of a compass. Jahncke failed to provide an adequate and competent crew as was its duty as a shipowner. Admiral Towing Co. v. Woolen, 9 Cir., 1961, 290 F.2d 641. Therefore, Jahncke is chargeable with the knowledge of the incompetence of its crew.

■ Lake Pontchartrain is known to be subject to varied and often severe weather changes, with considerable night fog during the winter. Jahncke relies on the 10:00 p. m. general weather forecast of the United States Weather Bureau for the Middle Gulf, which made no mention of fog. The tug owner has a duty, however, to send the vessel out prepared to meet conditions which are likely to befall the vessel. It is the owner's duty to see to it that a vessel's equipment is in safe working order. In re Jacobson, D.C.Tex., 1931, 52 F.2d 179. We hold that it failed to do so.

■ Petitioner contends that it is entitled to limitation because the accident was due to disregard by Brister, its pilot, of company's orders in failing to stop when visibility became limited to less than a half mile. However, this accident was not the result of a sudden and unexpected emergency but occurred for numerous reasons we have set forth which could have been ascertained by Jahncke's marine superintendent before the accident had he exercised due diligence. The negligence which caused this accident was, therefore, with the owner's privity or knowledge. The Linseed King, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932). Petitioner has failed to establish affirmatively that it exercised due diligence to furnish a seaworthy vessel, properly equipped and competently manned. See Lord v. Goodall, etc., S. S. Co. (Cir.Ct., D.Calif., 1877), 15 Fed.Cas. 884 (Case No. 8506), affirmed 12 Otto 541, 102 U.S. 541, 26 L.Ed. 224.

■ The Home Insurance Company, which is joined as a codefendant in the two direct actions here, seeks dismissal of these suits against it on the ground that the insurance coverage which it wrote in favor of Jahncke is an ocean marine policy which is excluded from the direct action provisions. They state that the Louisiana Direct Action Statute (LSA–R.S. 22:655), which authorizes direct suits against an insurer (now codified in the Louisiana Insurance Code 22:1–22:1459), is inapplicable to ocean marine insurance because such insurance is specifically excluded from the Code under the provisions of LSA–R.S. 22:611 which makes the Code applicable "to insurances other than ocean marine and foreign trade insurances."

The defendant insurer contends that its policy here is one of hull insurance and is known as ocean marine insurance. Two insurance agents testified in support of this view. However, by whatever name the present policy is called, whether hull insurance or marine protection and indemnity insurance, there is no doubt that The Home Insurance Company undertook to insure Jahncke against liability for damage to or destruction of another's property as a result of collision by the insured tug. The policy so states in unmistakable, clear language. This being true, the policy issued by Home insofar as it undertakes to insure against the liability of Jahncke for damage to or destruction of another person's property is liability insurance as defined by the Louisiana Insurance Code, LSA–R.S. 22:6(4). Maryland Casualty Co. v. Cushing, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954), upheld the right of a party to prosecute a direct action against the insurers of a vessel where the policy in that instance was a marine protection and indemnity policy. Judge Wright, in his opinion in Cushing v. Texas & P. Ry. Co., D.C., 99 F.Supp. 681, 684, pointed out that there was no real distinction to be made between hull insurance and marine protection and indemnity insurance. We look to the policy here and find that though it is a hull policy, it combines hull insurance with a collision liability clause. This is, therefore, for purposes of this suit, definitely a public liability policy and direct actions against the insurer are proper. Compare Reid v. Crain Bros. (La.App. 3 Cir., 1961), 134 So.2d 917; Lovless v. Employers' Liability Assurance Corporation, 5 Cir., 1955, 218 F.2d 714.

■ We have also concluded to grant the motion to dismiss and for summary judgment filed by defendant, The Home Insurance Company, to the claim of Bradford Coleman in the limitation proceeding which was not filed until April 1, 1963, the first day of the trial of this case on the merits.

The dates of numerous occurrences in this litigation are important to justify our dismissal of the Coleman action. On February 3, 1960, Jahncke filed its petition for limitation growing out of the accident on January 27, 1960. On February 5, 1960, an injunction was issued restraining the commencement of any and all suits, actions or legal proceedings except in the limitation proceeding, against petitioner or its insurers, pending final determination of the proceeding. On April 7, 1960, the court entered an order noting the default of all persons who had not filed claims and barring such persons from filing claims in the limitation proceeding.

On July 13, 1960 and January 18, 1961, this court relaxed its injunction and permitted filing of a direct action by Winn-Dixie Louisiana, Inc. against The Home Insurance Company.

On February 7, 1962, more than two years after the accident, pursuant to a motion of Bradford Coleman, the court again relaxed its injunction to permit Coleman to file a direct action against The Home Insurance Company.

No such action was ever filed. Now, more than three years after the accident, Coleman has attempted to file a claim in the limitation proceeding. No excuse for the delay has been offered to the court.

Tort actions in Louisiana are barred by the prescription of one year, i. e. one

year from the date of the injury (LSA–Civil Code, Articles 3536 and 3537). There is no doubt that defendant has been seriously prejudiced by the laches of claimant. Accordingly, the motion to dismiss and for summary judgment on these grounds is, therefore, granted.

We hold, therefore, that the petition for limitation should be denied and that an interlocutory decree on the issue of liability be entered in favor of The Greater New Orleans Expressway Commission, maintaining its claim against Jahncke Service, Inc. and The Home Insurance Company, and in favor of Winn-Dixie Louisiana, Inc., maintaining its claim against The Home Insurance Company. The claim of Bradford Coleman in the limitation proceeding is dismissed.

Decree will be entered accordingly.