733 F.2d 1161
 1985 A.M.C. 1460
 INSURANCE COMPANY OF NORTH AMERICA and Allstate Insurance
Company, Plaintiffs-Appellees Cross-Appellants,
v.
BOARD OF COMMISSIONERS OF the PORT OF NEW ORLEANS, Plaintiff-Appellee,
v.
JOHN J. BORDLEE CONTRACTORS, INC., Defendant-Appellant Cross-Appellee,
v.
ATLANTIC MARINE TRANSPORT CORP., Defendant-Appellant,
and
Southern American Insurance Co., Defendant-Appellee Cross-Appellant.
 No. 82-3390.
 United States Court of Appeals,
Fifth Circuit.
 June 11, 1984.
 
 Gelpi, Sullivan, Carroll & Laborde, Gerard T. Gelpi, Cliffe F. Laborde, Robert P. McCleskey, Jr., New Orleans, La., for defendants-appellants.
 Clayton G. Ramsey, Vivienne Monachino, New Orleans, La., for Atlantic Marine.
 James A. Cobb, Jr., New Orleans, La., for St. Paul.
 Camp, Carmouche, Palmer, Barsh & Hunter, Donald A. Hoffman, Robert I. Siegel, New Orleans, La., for Insurance Co. of North America and Allstate Ins. Co.
 Burke & Mayer, Jos. P. Tynan, New Orleans, La., for Board of Com'rs of the Port of New Orleans.
 Monroe & Lemann, Richmond Eustis, Nigel E. Rafferty, New Orleans, La., for Southern American Ins. Co.
 J.Y. Gilmore, Jr., New Orleans, La., for Underwriters at Lloyd's.
 Robert M. Contois, Jr., Robert T. Lemon, II, New Orleans, La., for American Commercial Lines, Inc.
 Thomas J. Grace, New Orleans, La., for Twin City Barge Lines, Inc.
 Benjamin W. Yancey, Rufus C. Harris, III, New Orleans, La., for Ina and Allstate.
 Ralph E. Smith, New Orleans, La., for Van Reekum Paper.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before POLITZ, JOHNSON and WILLIAMS, Circuit Judges.
 POLITZ, Circuit Judge:
 
 
 1
 This appeal presents the question of the extent of insurance protection afforded John J. Bordlee Contractors, Inc., by virtue of insurance policies on its vessel the M/V MR. PETE which was involved in a collision with the M/T PINA in the Mississippi River at New Orleans. Bordlee appeals, claiming coverage: (1) under a hull policy issued by Insurance Company of North America (INA) and Allstate Insurance Company (Allstate), (2) under a protection and indemnity policy (P & I) issued by INA and Allstate, and (3) under an excess liability policy issued by Southern American Insurance Company (Southern). In addition Bordlee contends that INA, Allstate and Southern should be estopped to deny coverage because of their post-casualty actions. Finding no reversible error, we affirm.
 
 Facts
 
 2
 At approximately 9:00 p.m. on December 19, 1979, the PINA, a Liberian tankship which was loaded with 60,000 barrels of light Arabian crude oil was upbound the Mississippi enroute to Good Hope, Louisiana. The PINA, under the command of its master, was piloted by a member of the New Orleans-Baton Rouge Steamship Pilots Association. No bow or anchor lookout was posted. Simultaneously, the M/V MR. PETE, a pushboat owned and operated by John J. Bordlee Contractors, Inc., was downbound pushing two tandem set barges to an intended docking at the Poydras Street Wharf. The crew of the MR. PETE consisted of two men, neither of whom possessed the Coast Guard license required by law to operate the MR. PETE.
 
 
 3
 On the night of the casualty, the sky was clear, there were no adverse weather conditions and visibility was unrestricted. Both vessels were equipped with radar and VHF-FM radios. The radios were set to monitor river traffic. The vessels were properly lighted. The PINA displayed a white stern light, red and green lights on the port and starboard, a white masthead light and a white range light. The MR. PETE carried the traditional white stern and red and green side lights, and also displayed two white lights on the masthead to signify a vessel towing.
 
 
 4
 The captain of the MR. PETE had angled his tow and was maintaining a course parallel to the east bank, the left descending bank of the river, to take advantage of river conditions as he perceived them. As it proceeded upbound the PINA was holding approximately forty percent off the east bank. When he first observed the PINA, the captain of the MR. PETE intended a starboard-to-starboard passing although he conceded a port passing was the norm for that area of the river. The captain and pilot of the PINA failed to notice that the MR. PETE had barges in tow despite the clearly visible towing light signal.
 
 
 5
 The vessels were not using their radar. Had the PINA done so it would have been aware of the tow. Attempts to communicate by radio were unsuccessful. In such instances, ship-to-ship communications are normally made by whistle. The record fairly reflects that neither vessel attempted to communicate by whistle. When the collision was imminent both vessels undertook evasive manuevers which were to no avail. The bow of the lead barge collided with the port bow of the PINA, cutting a 60 foot gash and spilling oil which immediately ignited and enveloped the PINA's port and spread across the river surface.
 
 
 6
 The district court, 532 F.Supp. 774, found both vessels violated navigational rules and were at fault. This finding is not seriously contested on appeal. In the opinion of the district court "this collision resulted from a total failure of communication and a complete disregard of the dangers posed by such failure on the part of both vessels." The pilot of the PINA assumed a port passing, the captain of the MR. PETE assumed a starboard passing, neither communicated his intention. In addition, despite inadequate lighting on the barges,[1] the PINA ignored the clearly visible tow light signals on the masthead. The record fully supports the trial judge's factual analysis.
 
 
 7
 The final part of the factual scenario pertinent to this appeal relates to the captains of the MR. PETE. Bordlee employed three captains, but only one possessed the license required by the Coast Guard for piloting a pushboat on the Mississippi.[2] The men worked two weeks and were off one week on a rotating basis. As a consequence of the rotation, during one week out of every three there was no licensed captain aboard the MR. PETE. In addition, 46 U.S.C. Sec. 405(b)(2) prohibits a work tour in excess of twelve hours except in emergencies. Consequently, even during the two-week period when a licensed captain was aboard, when the licensed captain was off watch and away from the bridge the MR. PETE was not under the supervision of an authorized captain.
 
 The Insurance
 
 8
 The MR. PETE was insured by three separate insurance policies. INA and Allstate jointly issued a primary hull policy, the American Institute Tug Form AMW 1723. INA and Allstate also jointly issued a protection and indemnity policy, standard form SP-23, AMW 1724. Southern issued a policy providing excess coverage over the hull and P & I policies.
 
 
 9
 The hull policy contained the following language:
 
 
 10
 The Underwriters shall not be liable for any loss, damage or expense arising out of the failure of the Assured to exercise due diligence to maintain the Vessel in a seaworthy condition after the attachment of this Policy; the foregoing, however, not to be deemed a waiver of any warranty of seaworthiness implied at law.
 
 
 11
 The P & I policy contained a provision which read: "Notwithstanding anything to the contrary contained in this policy, no liability attaches to the Assurer: ... For any loss, damage, or claim arising out of or having relation to the towage of any other vessel or craft." It carried an endorsement which declared:
 
 
 12
 Notwithstanding anything contained herein to the contrary, it is understood and agreed that as respects the above vessels [one of which is MR. PETE], this policy provides Excess Collision and Towers Liability, as provided by lines 78 through 111 of the American Institute Tug Form (2/1/76) 53R-1.
 
 Discussion
 
 13
 The trial court found that the hull policy was void because Bordlee had breached the policy's implied warranty of seaworthiness by manning the MR. PETE with unqualified personnel. The trial court also found that the endorsement on the P & I policy providing excess collision and tower's liability was excess hull coverage and not an additional P & I enumeration. The court further found that the excess policy applied only to the extent that the primary policies were effective. We affirm each finding and conclusion.
 
 A. The Hull Insurance
 
 14
 There is no dispute that the language of the collision and tower's liability provision of the hull policy would have extended coverage to the collision between the PINA and the MR. PETE if the policy were found applicable to the casualty. The district court interpreted the language of limitation quoted above as "an exclusion which purports to deny coverage in situations wherein there has been a breach of the continuing negative warranty of seaworthiness implied by law." We agree.
 
 
 15
 A warranty of seaworthiness by the owner is implied in every hull insurance policy unless expressly waived. Saskatchewan Government Insurance Office v. Spot Pack, 242 F.2d 385 (5th Cir.1957). The warranty is a continuing obligation that "the owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthiness condition.... The consequence of a violation of this 'negative' burden is merely a denial of liability for loss or damage caused proximately by such unseaworthiness." Id. at 388.
 
 
 16
 The trial court found that Bordlee did not maintain the vessel in a seaworthy condition after the attachment of the hull policy because the boat was staffed with unlicensed captains. The court further found that the unseaworthy condition was a proximate cause of the collision. As a consequence, the court held that the policy limitation barred coverage for the collision. This factual and legal finding is consistent with the long standing rule of admiralty that when a ship violates a statutory rule of navigation intended to prevent collisions, "the burden rests on the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." THE PENNSYLVANIA, 86 U.S. 125, 136, 22 L.Ed. 148 (1873). See also, Otto Candies, Inc. v. M/V MADELINE D, 721 F.2d 1034 (5th Cir.1983). The district court found the evidence insufficient to acquit this burden.
 
 
 17
 Bordlee argues that it was unaware that its licensed captain, assigned to the tug the date of the casualty, had gone ashore after completing his 12-hour watch. As a consequence of this lack of immediate knowledge, Bordlee contends that it was not guilty of a failure of due diligence in its efforts to maintain the vessel in a seaworthy condition. The trial court was not persuaded, nor is this court. The protestation rings hollow in light of the undisputed evidence that two-thirds of the time the MR. PETE was subject to the command of an unlicensed captain. Bordlee's hiring practices and crew scheduling resulted in the MR. PETE's unseaworthiness.
 
 B. The P & I Policy
 
 18
 Historically, P & I policies were issued to insure owners against risks outside the scope of coverage under standard hull policies. Seaboard Shipping Corp. v. Jocharanne Tugboat Corp., 461 F.2d 500 (2d Cir.1972). Typically, these policies cover enumerated risks. The policy before the court lists 14 risks, none of which even arguably applies to the subject collision. The claim of coverage for the collision under the P & I policy must therefore arise from the endorsement. The question which confronts us is whether the endorsement added collision and tower's liability as an enumerated P & I risk or whether it merely provided additional and excess coverage to the hull policy.
 
 
 19
 As the bard once suggested, the appellation of the rose does not occasion its pleasant odor. Name does not control substance. Regardless of the title, one must look to the provisions and conditions of a policy to determine the risks the insurer has undertaken. Although helpful, the label is not conclusive. Greater New Orleans Expressway Com'n v. Tug Claribel, 222 F.Supp. 521 (E.D.La.1963). The express language of the endorsement makes clear that Bordlee's P & I policy was modified to provide additional collision and tower's liability. Bordlee, in effect, purchased extra hull coverage. The fact that this addition of traditional hull policy coverage was in the form of an endorsement to the P & I policy did not automatically transform that coverage to an enumerated P & I risk. The endorsement merely added a hull policy dimension to the P & I policy. This excess collision and tower's liability was subject to the same implied warranty of seaworthiness applicable to all hull policies. Bordlee's breach vitiated the hull policy for the loss now before the court. Bordlee's breach also relieved the insurers from any liability under the endorsement to the P & I policy.
 
 
 20
 A breach of the implied warranty of seaworthiness does not void the entire policy, it "only exonerates the underwriter for loss or damage proximately caused by the unseaworthiness condition." Lemar Towing, Inc. v. Fireman's Fund Insurance Co., 352 F.Supp. 652, 660 (E.D.La.1975), aff'd 471 F.2d 609 (5th Cir.1973). Since the warranty of seaworthiness attached only to the portion of the P & I policy providing hull coverage, only that element of coverage fails.
 
 C. The Excess Liability Policy
 
 21
 Southern issued a policy extending excess P & I and excess hull liability to the MR. PETE. The issue presented is whether this policy incorporates by reference the primary hull and P & I policies. In resolving this question we look to applicable state law. Wilburn Boat Co. v. Fireman's Fund Ins., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955). Louisiana law in effect at the time of the casualty provided:
 
 
 22
 No agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be valid unless it is in writing and physically made a part of the policy or other written evidence of insurance, or it is incorporated in the policy or other written evidence of insurance by specific references to another policy or written evidence of insurance. This Section shall not apply to contracts as provided in Part XV of this Chapter.
 
 
 23
 The provisions of this Section shall apply where a policy or other written evidence of insurance is coupled by specific reference with another policy or written evidence of insurance in existence as of the effective date hereof or issued thereafter.
 
 
 24
 (Emphasis added.) La.R.S. 22:628. The inquiry is whether the excess policy incorporates the primary policy by specific reference. We find that the excess policy phrase "and as per primary policies" indicates the intent to provide excess coverage subject to the provisions of the primary policies. This is consistent with Louisiana law,[3] and is supported by the fact that the face of the excess policy specifically lists the primary policies as the policies for which coverage is supplemented.
 
 
 25
 Policies such as that now before the court, in the posture presented, are to be construed in favor of what reason and probability dictate was intended by the parties. Eagle Leasing Corp. v. Hartford Fire Ins. Co., 540 F.2d 1257 (5th Cir.1976). So construed, we are convinced that the Southern policy was written with the primary policies in mind, and the coverage intended was to be an extension of that provided by the primary policies. Southern did not intend to be a primary insurer. If the primary policies did not extend coverage, Southern undertook no responsibility. The vitiation of the underlying hull policy and P & I endorsement for this particular loss releases Southern.
 
 Estoppel
 
 26
 Bordlee maintains that the conduct of the insurers after the casualty was such that they should have been estopped to deny coverage. The trial court disagreed; this court disagrees.
 
 
 27
 Absent federal legislation or jurisprudential rubric, state law applies to marine insurance matters. Wilburn Boat Company v. Fireman's Fund Insurance Company, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955); Walter v. Marine Office of America, 537 F.2d 89 (5th Cir.1976). Under Louisiana law the investigation of a claim or loss does not constitute conduct which may be taken as a waiver of a policy provision or exclusion. La.R.S. 22:651 provides in pertinent part:
 
 
 28
 None of the following acts by or on behalf of an insurer shall be deemed to constitute a waiver of any provision of a policy or any defense of the insurer thereunder: ...
 
 
 29
 (3) Investigating any loss or claim under any policy or engaging in negotiations looking towards a possible settlement of any such loss or claim.
 
 
 30
 Bordlee contends that the insurers' investigation into the casualty, particularly including its conduct of the hearing before the Coast Guard examiner, prevents their denial of coverage. During that hearing John J. Bordlee, Sr. testified about his hiring of unlicensed captains. He conceded that he knew that the captain found to be in charge of the MR. PETE at the time of the collision was unlicensed. This was the first time counsel for the insurers were informed of this material fact. Counsel advised their clients of this development and of its legal significance. Shortly thereafter INA and Allstate notified Bordlee of their denial of coverage. The trial judge cited the Louisiana statute and rejected Bordlee's plea of estoppel. The trial court's statutory interpretation is consistent with that of the Louisiana courts. In Blum v. Cherokee Insurance Company, 336 So.2d 894, 897 (La.App.1976), Judge Harry T. Lemmon (now a member of the Louisiana Supreme Court) wrote: "We construe R.S. 22:651 to mean simply that mere investigation or negotiation do not alone constitute a waiver of an insurer's right to claim the benefits of an applicable policy provision." The actions by the insurers' representatives were consistent with an investigation of the pending and expected claims. Estoppel is not warranted.
 
 
 31
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 The barges carried portable lights which were visible substantially less than a mile. This contravenes 33 C.F.R. Sec. 80.16a(b), (i), and (j), requiring visibility for two miles
 
 
 [2]
 46 U.S.C. Sec. 405(b)(2) prescribes:
 An uninspected towing vessel in order to assure safe navigation shall, while underway, be under the actual direction and control of a person licensed by the Secretary to operate in the particular geographic area and by type of vessel under regulations prescribed by him. A person so licensed may not work a vessel while underway or perform other duties in excess of a total of twelve hours in any consecutive twenty-four-hour period except in case of emergency.
 
 
 [3]
 In Hunter v. Office of Health Services, 385 So.2d 928 (La.App. 2d Cir.1980), the Louisiana appellate court found the phrase "the provisions of the immediate underlying policy are incorporated as a part of this policy" sufficient to signify the intent in an excess coverage policy to limit coverage to that extended by the primary policy