892 F.2d 386
 Stanley R. SIFERS, Plaintiff,
v.
GENERAL MARINE CATERING COMPANY, Defendant-Third Party
Plaintiff-Appellant,
v.
FIRST STATE INSURANCE CO. and Louisiana Insurance Guaranty
Association, Third Party Defendants-Appellees.
 Nos. 86-3494, 86-3685, 86-3760, 87-3164, 87-3606, 87-4387,
87-4798, 88-3308, 89-3453, 89-4046, 89-4671.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 3, 1990.
 
 John J. Cooper and Kenneth A. Beobay, New Orleans, La., for General Marine Catering Co.
 Earl S. Eichin, Jr., O'Neil, Eichin & Miller, New Orleans, La., for First State Ins. Co.
 Thomas E. Balhoff, Judith R. Atkinson, Carey J. Guglielmo, Charles A. Schutte, Jr., Mathews, Atkinson, Guglielmo, Marks & Day, Baton Rouge, La., for La. Ins. Guar. Ass'n.
 Robert C. Stern, Perrin C. Butler, Perrin, Butler, Ltd., Metairie, La., for Blair, et al.
 S. Daniel Meeks, Abbott, Webb, Best & Meeks, New Orleans, La., for Sealift, Inc., Elsie A. Dominick and William F. Smith.
 Terry W. Sercovich, Belle Chasse, La., for Allied Towing Services, Inc. and Lafayette Crewboats, Inc.
 Kerry P. Camarata, Thibodaux, La., for John David Naples.
 Robert B. Nolan, New Orleans, La., amicus curiae S.H.R.M. Catering in No. 86-3494.
 Robert B. Nolan and Joseph B. Guilbeau, New Orleans, for S.H.R.M. Catering in No. 87-4387.
 Thomas G. O'Brien and Edwin C. Laizer, Adams & Reese, New Orleans, for S.H.R.M. Catering in No. 87-4798.
 Robert B. Nolan and Deborah B. Rouen, Adams & Reese, New Orleans, for S.H.R.M. Catering in No. 89-4671.
 Alex D. Chapman, Jr. and J. Wendel Fusilier, Ville Platte, La., for amicus curiae Joseph Mike Deshotels.
 Andre J. Mouledoux and Alan G. Brackett, Hebert, Mouledoux & Bland, New Orleans, La., for appellants in No. 88-3308.
 Anthony A. Dingleman, Thibodaux, La., for Duplantis.
 Paul J. Galuszka and Gregory Bulluing, New Orleans, La., for Galuszka.
 Richard J. Arsenault and Stacy DeMartini Bruton, Neblett, Beard & Arsenault, Alexandria, La., for Billy D. Cox and Sandra Elaine Cox.
 Appeals from the United States District Courts for the Eastern and Western Districts of Louisiana.
 Before GEE, RUBIN, and SMITH, Circuit Judges.
 PER CURIAM:
 
 
 1
 Introduction.
 
 
 2
 The Louisiana Insurance Guaranty Association (LIGA) is a nonprofit, unincorporated creation of state law, designed to reinsure the obligations of insolvent insurers doing business in Louisiana. Born after the 1950's and 1960's, a period that witnessed increased insolvencies by insurance carriers, LIGA was fashioned by the Louisiana Legislature in 1970. The statute mimicked a uniform state model that was offered nationally to protect the public through the device known as "insurance guarantee associations."
 
 
 3
 As a condition of doing business in Louisiana, insurance carriers receiving the statutory benefit of being reinsured were forced to finance LIGA through assessments. In the event that a member-carrier became insolvent, it was envisioned that LIGA would assume all the benefits and obligations of the direct insurance policies underwritten by the defunct carrier. Some notable exceptions, such as life insurance and ocean marine insurance, were carved out of the enabling statute. That is, LIGA could not be held at risk for claims made by policyholders or beneficiaries who possessed, for example, life or ocean marine insurance written by insolvent carriers.
 
 
 4
 For purposes of this consolidated appeal, arising from eleven separate cases,[1] we are concerned primarily with the statutory provision that exempts LIGA from reinsuring the claims of "ocean marine insurance," which, until recently, remained an undefined term of art under Louisiana's insurance code. The claimants in these separate cases share the common attributes that all have alleged injuries arising from maritime service, all have no recourse against certain defunct insurance companies, and all now seek recovery from LIGA as a reinsurer.
 
 
 5
 The claimants believe that LIGA is responsible for their injuries as a reinsurer of outstanding "Protection and Indemnity" (P & I) and "Worker's Compensation/Employer Liability" (WC/EL) policies carried by employers, owners, and operators involved in these cases. The claimants argue that such policies do not constitute "ocean marine insurance," as LIGA believes, within the meaning of the statutory exception and that, accordingly, LIGA must honor their claims.
 
 
 6
 Jurisdiction here is based upon federal questions presented under the Jones Act[2] and general maritime law. The courts of the Eastern and Western Districts of Louisiana have been sharply divided concerning the proper interpretation of LIGA's statutory obligations. The issues presented raise complicated issues of insurance law and, until recently, there has been a dearth of state caselaw on the subject.
 
 
 7
 This consolidated appeal, before us for the second time, has a lengthy history.[3] Since the resolution of the dispositive issues turned upon the statutory obligations of LIGA, and the outcome would have an immediate impact upon many pending state and federal cases, we certified a narrow question of Louisiana insurance law to the Louisiana Supreme Court in May 1988.[4] With the benefit of that court's resolution of our certified question,[5] and its recent decision in Backhus v. Transit Casualty Co.,[6] the state law applicable to the separate cases before us is now considerably more settled. While new parties have since been added to this appeal and others have settled their disputes,[7] the issues remain essentially the same.
 
 
 8
 We are presented with seven separate issues, some of which are uniformly relevant to all cases, while other issues have an impact upon only one. We elect to address these issues seriatim, as argued orally before us.[8]
 
 I.
 
 9
 The Characterization of "Protection and Indemnity" Insurance.
 
 
 10
 The claimants and insurers in these various cases seek to obtain payment from LIGA on the basis of insurance policies which the defendants purchased from several liability insurers that have since become insolvent. Each of the policies purporting to afford P & I insurance provides coverage against liability for personal injuries and damage to the property of third persons. Some of the claimants seek to hold LIGA accountable for damages of the first kind; others, for damages of the second kind.
 
 
 11
 LIGA's liability for these damages turns upon the construction of certain provisions of Louisiana's Insurance Guaranty Association Law (IGAL).[9] Although the statute in general terms makes LIGA responsible for claims that arise under "all kinds of direct insurance," section 1377 exempts from coverage several enumerated types of direct insurance, including "ocean marine" insurance.[10] LIGA contends that P & I insurance is a variety of "ocean marine" insurance and that, therefore, it is not obligated to pay claims arising under these policies underwritten by insolvent carriers. The claimants reject the basic premise of this argument, contending that P & I insurance, properly characterized, is not a species of "ocean marine" insurance.
 
 
 12
 The district courts whose judgments are now before us on appeal did not resolve the question uniformly. We are therefore presented with the question whether, for purposes of the IGAL, "ocean marine" insurance includes P & I insurance against (i) liability for personal injuries and/or (ii) liability for damage to the property of third parties.
 
 
 13
 The Louisiana Supreme Court's decision in Backhus, issued shortly after oral argument herein, is dispositive of the first part of this question. In that case, the plaintiff, an employee aboard an ocean-going vessel, sued her employer's insurer and LIGA to recover damages for personal injuries she sustained while on board the vessel. Coverage against liability for such injuries was provided under a P & I policy. The court described the principal issue in these terms: "whether 'protection and indemnity' insurance constitutes 'ocean marine insurance' under the terms of the Louisiana Insurance Code and the [IGAL]."[11] To this question the court gave an unequivocal, affirmative answer.
 
 
 14
 The Backhus court's ruling rests upon several considerations. First, the court noted that although the code does not define the term "ocean marine" insurance, it does define the closely related term "marine and transportation (inland marine)" insurance.[12] Among the types of insurance included within that category is "marine protection and indemnity insurance," which includes insurance "against legal liability ... of the insured for personal injury, illness or death or for loss of or damage to the property of another."[13] This definition, the court reasoned, supports the view that "protection and indemnity" insurance, even that which provides protection against liability for personal injuries, is a form of "ocean marine" insurance.
 
 
 15
 Second, the court, after invoking the civilian interpretive principle that "words of art and technical terms must be given their technical meaning when the law involves a technical matter,"[14] reviewed several leading treatises and published articles concerning maritime insurance law. The court found that "[p]rotection and indemnity insurance is consistently treated as marine insurance within the industry."[15]
 
 
 16
 Third, the court examined the IGAL for evidence of legislative intent to protect personal injury claimants who are entitled to recover under "protection and indemnity" policies. The court found no such evidence. Citing its recent decision in Deshotels, the court remarked that the legislature, in enacting section 1377, had intended to exclude certain "kinds of policies," rather than certain "kinds of risks," from coverage.[16] One of the kinds of policies so excluded, the court noted, was "ocean marine" insurance.
 
 
 17
 Backhus therefore resolves the question of whether insurance covering liability for personal injuries afforded under a P & I policy constitutes "ocean marine" insurance. It follows, then, that those plaintiffs who have suffered personal injuries, and those defendants who have been forced to pay claims for such injuries, have no recourse against LIGA on the basis of the defendants' P & I policies.
 
 
 18
 Limited to its facts, Backhus does not directly address the question whether insurance against liability for damage to the property of third persons that is afforded under a P & I policy constitutes "ocean marine" insurance. Nevertheless, the principles set forth in that decision dictate an affirmative answer. The court did not limit its holding to P & I insurance against the risk of personal injuries to crew members and third persons; instead, it declared, without limitation, that "the term 'ocean marine insurance' includes protection and indemnity insurance."[17]
 
 
 19
 Furthermore, the various considerations that underlie Backhus lead ineluctably to the conclusion that P & I insurance against third-party property damage is "ocean marine" insurance. Louisiana's Insurance Code provides that "marine and transportation (inland marine)" insurance, which the court regarded as roughly synonymous with "ocean marine" insurance, includes "marine protection and indemnity insurance ... against legal liability of the insured for personal injury, illness or death or damage to the property of another."[18] Further, within the maritime industry, insurance against liability for damage to the property of third parties that is afforded under P & I policies is widely regarded as ocean marine insurance. This, at any rate, is the apparently unanimous opinion of leading commentators upon the subject of marine insurance.[19]
 
 
 20
 Finally, nothing in the IGAL points to any legislative intent to afford special protection to third parties seeking to recover for property damage on the basis of P & I policies. To the contrary, as the state supreme court observed in Deshotels, section 1377 excludes from the IGAL's coverage types of policies rather than types of risks. Thus, if the particular policy in question fits within one of the excluded categories, the type of risk covered is immaterial, at least if that risk is traditionally covered by such a policy. For these reasons, we conclude that P & I insurance covering personal liabilities and damages to the property of third persons is "ocean marine" insurance for purposes of the IGAL.
 
 
 21
 Because we have decided this question on the authority of the state supreme court's decision in Backhus, it is unnecessary to consider LIGA's argument that certain recent legislative amendments to the IGAL,[20] which allegedly make it clear that "ocean marine" insurance embraces P & I and WC/EL insurance, are "interpretive" and therefore should be given retroactive effect. We also reject LIGA's argument that these amendments require us to "reconsider" the Louisiana Supreme Court's opinion in Deshotels, written in response to our certified question. The question, which arose in several of the cases consolidated in this appeal, was whether insurance covering liability for personal injuries that is afforded under a WC/EL policy is "ocean marine" insurance under the terms of the IGAL. The Deshotels court held that WC/EL policies are not "ocean marine insurance," and thus LIGA would have to assume such claims.[21]
 
 
 22
 We have considerable doubt as to the propriety of our "reexamining" the supreme court's answer to the question of WC/EL insurance at this point in the proceedings. Ordinarily, a state court's answer to a certified question is final and binding upon the parties between whom the issue arose.[22] Such an answer, therefore, generally is the "law of the case" in any further federal court proceeding involving those parties.[23] We see no reason to depart from this general rule. Further, because we consider the state court's answer to be binding in the proceedings between the parties to the certified case, that answer is now the law of this circuit. For that reason it is binding as well upon those parties in this appeal who were not parties to the certified case.
 
 
 23
 In addition, we question whether the Louisiana Supreme Court would conclude that the recent legislation overruled its decision in Deshotels. In Backhus, decided well after the state legislature amended the IGAL, the court, although not specifically addressing the question of the effect of the amendments upon Deshotels, did recite the holding of that case with approval. For these reasons, we conclude that Deshotels instructs this appeal.
 
 II.
 
 24
 The Compatibility of the "Other Insurance" Clauses in
 
 
 25
 Sealift's P & I and WC/EL Policies.
 
 
 26
 One of the claimants, Sealift, Inc. (Sealift), obtained two policies from Transit Casualty Co. (Transit), now defunct, that covered claims for injuries to the persons and property of third parties. One--a P & I policy--would fall outside the scope of the IGAL, as we have concluded supra; the other--a WC/EL policy--would fall within it, according to Deshotels.
 
 
 27
 Thus, a dispute understandably arises regarding which of the two policies covers Sealift's claim, because of the presence, in both policies, of an "other insurance" clause. The clause in the WC/EL policy reads as follows:
 
 
 28
 Such insurance shall not attach with respect to any liability of the insured if there is in force for the insured or for his benefit a protection and indemnity ... policy which would cover any part of such liability....[24]
 
 
 29
 The corresponding clause in the P & I policy is cast in much broader terms:
 
 
 30
 Where the assured is, irrespective of this policy, covered or protected against any loss or claim which would otherwise have been paid by this Company, under this policy, there shall be no contribution or participation by this Company on the basis of excess, contributing, deficiency, concurrent, or double insurance or otherwise.[25]
 
 
 31
 The claimant's first argument to the effect that the WC/EL policy affords coverage is grounded in the phrase "in force," as used in that policy's "other insurance" clause. As the claimant correctly observes, the "other insurance" clause affords coverage under the WC/EL policy unless a P & I policy covering the same risks is "in force."
 
 
 32
 Citing several Louisiana appellate court decisions, the claimant contends that the question of whether a particular policy is "in force" must be determined as of the date of the judgment rather than of the accident.[26] The claimant's position draws further support from a recent decision in which this court reached precisely the same conclusion.[27] Because the issuer of the P & I policy was insolvent when the personal-injury plaintiff obtained judgment against the claimant and its insurer, the claimant concludes, the P & I policy was not "in force" and, therefore, the WC/EL policy's exclusionary clause was not triggered. The claimant argues that coverage thus is available under the WC/EL policy.
 
 
 33
 The same argument was made in Backhus without success. The insurer in that case had issued both a WC/EL policy and a P & I policy, the former containing an "other insurance" clause identical to that in Sealift's WC/EL policy. Like the claimant here, the plaintiff contended that the P & I policy was not "in force" because it had been cancelled by the Missouri Commissioner of Insurance prior to the date of judgment.
 
 
 34
 The Backhus court was not persuaded. Although it did not say so explicitly, the court patently understood that the date of the accident, rather than the date of judgment, determines whether a policy is "in force" for purposes of an exclusionary clause in another policy. It observed that the lower courts in that case "correctly gave effect to [the WC/EL exclusionary] clause and found that the protection and indemnity policy ... was in force."[28]
 
 
 35
 The claimant's second argument, however, rests upon the claim that the "other insurance" clauses in the two policies are irreconcilable, or "mutually repugnant." According to the claimant, enforcement of both clauses, read literally, leads to a logical paradox: The first policy is ineffective if the second is effective, but in order to determine whether the second is effective, one must first know whether the first is ineffective.
 
 
 36
 Under Louisiana law, the claimant maintains, such mutually repugnant clauses must be ignored, and both policies given operative effect. The claimant further contends that because the insured in such a case has "double insurance" against the risks covered by the policies, a claimant who is injured by the insured may obtain full payment under either policy, at least where both policies are written by the same insurer.
 
 
 37
 This argument rests upon a line of decisions, culminating in Graves v. Traders & Gen. Ins. Co.,[29] that chronicle the Louisiana courts' efforts to solve the problems generated by "other insurance" clauses. In Graves, the court, after concluding that the clauses in the insured's policies could not be "reconciled," observed,
 
 
 38
 [I]f the provisions of both policies are given effect, neither insurer would be liable. Such a result would render all insurance nugatory and produce an absurdity which neither the insured nor the insurers contemplated.[30]
 
 
 39
 Following the lead of several of the state's intermediate appellate courts, the court concluded that the proper solution to the problem created by such "mutually repugnant" clauses is to deny effect to both of the clauses and to make the insurers of both policies primarily liable for the claim.[31]
 
 
 40
 Although LIGA acknowledges this Louisiana authority and admits that it requires the negation of mutually repugnant "escape clauses," LIGA denies that such authority is relevant to the question presented here. According to LIGA, the clause in Sealift's WC/EL policy, unlike that in Sealift's P & I policy, is not in fact an "escape clause," but rather is an "exclusion clause" whose function is to exclude coverage under the policy if a P & I policy covering the same risk exists.
 
 
 41
 For this reason, LIGA insists, both of the clauses in question can be given full effect. The P & I policy provides that if another policy affords coverage, then the P & I policy does not. The WC/EL policy is not such "another policy," the argument continues, because that policy's very terms exclude such coverage when, as here, a P & I policy exists. Thus, LIGA concludes, the P & I policy's "other insurance" clause is never activated. Its conclusion in this matter, LIGA further argues, is buttressed by this court's decision in Farrell Lines, Inc. v. Insurance Co. of N. Am.,[32] and by Backhus.
 
 
 42
 LIGA's argument is without merit. As an initial matter, we question whether the distinction which LIGA attempts to draw between an "escape" clause and an "exclusion" clause is significant: Any clause that permits an insurer to deny coverage can be accurately characterized as an "escape" clause. The effect of the "other insurance" clause in the WC/EL policy is to deny coverage under that policy or, in other words, to allow the issuer of the policy to "escape" liability thereunder completely. The effect of a more typical escape clause is undeniably the same.
 
 
 43
 Indeed, we can discern only one real difference between the typical escape clause and that found in the WC/EL policy: The clause in the WC/EL policy, because it identifies one particular type of policy, the existence of which will preclude coverage (a P & I policy), is more specific. Under Louisiana law, however, this distinction is of no moment. The intermediate appellate opinion in Graves,[33] which the state supreme court noted with approval,[34] expressly rejected the so-called "specificity" rule, that is, the rule that the more "specific" of two competing "other insurance" clauses should be enforced as a means of resolving the "other insurance" paradox.[35]
 
 
 44
 In addition, the rule that emerges from the Louisiana decisions is that regardless of the nature or type of the "other insurance" clause contained in the competing policies, when those clauses cannot be reconciled "logically," both clauses must be ignored and the policies enforced accordingly. No matter which clause an interpreter may choose to begin with, the process of giving meaning to the two invariably ends up in an infinitely regressing spiral.[36]
 
 
 45
 The decisions upon which LIGA relies--Farrell Lines and Backhus--do not mandate a different result. In Farrell Lines, the insured sought to recover from its general liability insurer the cost which it had incurred in defending itself against a personal injury action. The insurer denied liability, pointing to a provision in the insurance policy that purported to exclude coverage if the loss were covered by a P & I policy and alleging that the insured had obtained such a policy through another insurer.
 
 
 46
 While admitting that it had purchased a P & I policy, the insured denied that the policy covered the loss in question. According to the insured, the policy applied only to losses incurred by the insured in its capacity as "vessel owner," and the loss in question had been incurred by activities it had undertaken in a different capacity (its capacity as "lessee" of a cargo container).
 
 
 47
 Rejecting the insured's construction of the P & I policy, the court found that that policy did cover the loss and therefore enforced the exclusionary provision in the general liability policy. Farrell, therefore, did not involve a conflict between "other insurance" clauses in competing policies.
 
 
 48
 Backhus likewise is inapposite. Endorsement 6 of the P & I policy in Backhus declared that that policy was intended to provide "primary" insurance and specifically nullified any "other insurance" clauses which the policy may have contained.[37] Because of this endorsement, the court reasoned, "the escape clause in the workers' compensation policy [was] not offset by an 'other insurance' clause in the protection and indemnity policy that, when read together, would render both policies inapplicable."[38] In other words, the endorsement eliminated the conflict between the clauses in the two policies and, by negating the clause in the P & I policy, removed the paradox that otherwise would have arisen. There is no comparable nullificatory endorsement in Sealift's P & I policy.
 
 
 49
 It follows that the district court was correct in finding that the "other insurance" clauses in Sealift's WC/EL and P & I policies were mutually repugnant and could not be enforced. Because the district court's decision in this matter has not been challenged in any other respect, we affirm its conclusion that the claimant may obtain payment from LIGA on the basis of the WC/EL policy.
 
 III.
 
 50
 Recovery from LIGA in Excess of the Statutory Maximum.
 
 
 51
 Having held that Louisiana law requires LIGA to reinsure claims arising from WC/EL policies, we now resolve the following issue: whether the coverage afforded an insured employer of an insolvent member-insurer of LIGA under the Jones Act, pursuant to a coverage B maritime endorsement of a standard WC/EL policy, including maintenance and cure, is limited as against LIGA to the $149,900 statutory maximum.[39] We begin our analysis by noting that the IGAL provides in pertinent part,
 
 
 52
 (1) The association shall:
 
 
 53
 (a) Be obligated to the extent of the covered claims ... but such obligation shall include only that amount of each covered claim, except return premiums, which is in excess of [$100.00 and is less than $150,000.00].... Notwithstanding the foregoing, the association shall pay the full amount of any covered claim arising out of a worker's compensation policy. In no event shall the association be obligated to a policyholder or claimant in an amount in excess of the obligation of the insolvent insurer under the policy from which the claim arises.[40]
 
 
 54
 A standard WC/EL policy contains three types of coverage, two of which are relevant here. Coverage A applies to benefits afforded by worker's compensation statutes. This section provides,
 
 
 55
 Coverage A: The company shall be directly and primarily liable to any person entitled to the benefits of the workmen's compensation law under this policy....
 
 
 56
 All of the provisions of the workmen's compensation law shall be and remain a part of this policy as fully and completely as if written herein, so far as they apply to compensation and other benefits provided by this policy and to special taxes, payment into security or other special funds, and assessments required of or levied against compensation insurance carriers under such law. [Emphasis added.]
 
 
 57
 Coverage B provides protection from damage suits filed by employees and, when carrying a maritime endorsement, covers Jones Act claims. This section provides,
 
 
 58
 Employer's Liability: To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury by accident or disease, including death at any time resulting therefrom,
 
 
 59
 (a) sustained in the United States of America ... by any employee of the insured arising out of and in the course of his employment by the insured. [Emphasis added.]
 
 
 60
 Coverage B specifically states that it does not apply
 
 
 61
 to any obligation for which the insured or any carrier as his insurer may be held liable under the workmen's compensation or occupational disease law of a state designated in Item 3 of the declarations, any other workmen's compensation or occupational disease law, any unemployment compensation or disability benefits law, or under any similar law. [Emphasis added.]
 
 
 62
 The claimants contend that Jones Act and general maritime claims brought under a WC/EL policy containing Coverages A and B are claims "arising out of a worker's compensation policy" and are not, therefore, limited by the $149,900 statutory ceiling. In support of their argument, the claimants first note that section 22:1378 states, "This part shall be liberally construed to effect the purpose under section R.S. 22:1376, which shall constitute an aid and guide to interpretation." Moreover, section 22:1376 states that the purpose of the Act "is to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policy holders because of the insolvency of a insurer ..." (emphasis added). According to the claimants, the fact that the policies in effect in these cases were designated as WC/EL policies, coupled with the legislative mandate that the law be liberally construed to avoid financial loss to claimants, requires a finding that these cases arose from a standard worker's compensation policy.
 
 
 63
 The claimants also argue that their interpretation of the policies is supported by the Louisiana Supreme Court's holding in Deshotels. There, the court stated that LIGA insurance applies to "kinds of insurance policies, rather than different risks ... [and that therefore] ... the exclusion for ocean marine insurance does not apply to employers liability policies which incidentally cover risks associated with maritime activities."[41] The claimants reason that the kind of policy at issue in these cases was a WC/EL policy that "incidentally" covered other risks and that, therefore, the statutory cap does not limit those risks.
 
 
 64
 By contrast, LIGA contends that the WC/EL policies here are "two separate, distinct, mutually exclusive coverages" that were included in a single policy solely for convenience. LIGA notes that the Act itself does not define worker's compensation, but that the Louisiana Insurance Code in general defines employer liability separately from worker's compensation[42] and treats these forms of liability differently throughout the code. In addition, LIGA cites secondary authority.[43]
 
 
 65
 Had there been the two policies issued in this case, each contained in a separate document, it is evident that these Jones Act and general maritime claims would not "arise" from a worker's compensation policy. It would be irrational to conclude that such claims do arise from such a policy simply because two separate kinds of insurance were contained in a single document. As for the claimants' argument that the employer-liability risks were merely incidental to the worker's compensation risks, it could equally be said that, under this "total" policy, the worker's compensation risks were merely incidental to the employer liability risks. We therefore conclude that the statutory cap does apply to Jones Act and general maritime claims brought here pursuant to a WC/EL policy.
 
 IV.
 
 66
 Recovery of Legal Rate of Interest.
 
 
 67
 Several of the cases before us require that we determine whether LIGA is liable for the legal rate of interest on any judgment to the extent that the interest causes the LIGA statutory liability limit of $149,900 to be exceeded. The claimants contend that LIGA is liable for postjudgment interest on the full amount of the judgment entered against it, even if that judgment exceeds $149,900, as well as for any portion of the interest that, when combined with the underlying judgment, exceeds the statutory cap. LIGA argues that it is not liable either for the postjudgment interest that would cause its total liability to exceed the $149,900 statutory cap or for any interest on a judgment that itself exceeds $149,900.
 
 
 68
 The legislation provides that LIGA's obligation to pay claims submitted to an insolvent insurer "shall include only that amount of each covered claim ... which is in excess of one hundred dollars and is less than one hundred fifty thousand dollars...." In Aramburo v. Travelers Ins. Co.,[44] the court held that LIGA may be required to pay interest at the legal rate, even if to do so would cause LIGA's liability to exceed the $149,900 statutory cap.[45] LIGA concedes that Aramburo is not distinguishable. It notes, however, that we are not bound by the decision of the state court of appeals. Further, LIGA argues that the Louisiana Supreme Court's denial of a writ in Aramburo should not be "equated to a complete judicial stamp of approval by that Court of or for the lower court decision." Finally, LIGA contends that Aramburo "was erroneously and incorrectly decided ... based upon an imperfect understanding of LIGA and the enabling statute which created it."
 
 
 69
 "In reviewing matters of state law where there is no state supreme court decision on point, we follow the relevant appellate state court decisions 'absent strong indication that the [state] Supreme Court would decide the issue differently.' "[46] Additionally, while "[t]he denial of a writ of certiorari has no official precedential value; nevertheless, [prior to denying the writ,] the entire court has spent considerable time, effort and discussion in determining whether it believes any errors of law are presented."[47] Consequently, while neither the opinion nor the denial of the writ in Aramburo constitutes binding precedent, we do not ignore them.
 
 
 70
 In Aramburo, the court based its decision upon a reading of the entire IGAL, particularly sections 22:1382(1)(a), (b), 22:1378, and 22:1376.[48] The court first concluded that "legal interest and costs are not part of a 'covered claim' in the case of an ordinary personal injury claim."[49] It also determined, however, that
 
 
 71
 R.S. 22:1382(1)(b) 's deeming LIGA 'the insurer to the extent of its obligation on the covered claim' ... with 'all the ... duties and obligation of the insolvent insurer as if the insurer had not become insolvent' places upon LIGA the obligation that the insurer sued on such a claim would have, including the payment of legal interest and costs in addition to the claim, even when the claim is for the statutory maximum....[50]
 
 Moreover, the court noted that
 
 72
 [L]iberal construction to achieve those purposes [of R.S. 22:1376] requires (1) that LIGA not be rewarded for excessive delay in payment, as it would be if it could invest the [$149,900] limit in a large claim yet not have to pay interest, and (2) that the claimant not be forced to suffer the added financial losses of interest and costs in a disputed claim....[51]
 
 
 73
 In support of its argument that Aramburo was incorrectly decided, LIGA points to the fact that the legislature very easily could have provided for recovery of legal interest in addition to, or over and above, the amount provided in the statute to be paid by the fund, but chose not to do so. LIGA then notes that in one instance, the legislature specifically has provided for a statutory maximum recovery, with interest allowed in addition to that maximum.[52] According to LIGA, the legislature's failing to provide for interest under this statute, while specifically providing for it under another statute, is evidence that the legislature did not intend that interest be recoverable here.
 
 
 74
 Had the medical malpractice statute been enacted before the enactment of the LIGA statutes, the legislature's failure to provide for interest under LIGA, while doing so in medical malpractice cases, would have been persuasive authority that the legislature did not intend that interest be recoverable under LIGA. The Medical Malpractice Act was enacted, however, in 1975, five years after the enactment of the LIGA statutes. Consequently, it is possible that the legislature, in enacting the LIGA statutes, simply failed to consider whether interest should or should not be recoverable.
 
 
 75
 Further, Aramburo was decided in 1983. Had the legislature objected to the awarding of interest in LIGA cases, it could have amended the statute specifically to exclude interest. Its failure to do so is certainly as significant, so LIGA reminds us, as its failure to provide for interest at the onset.
 
 
 76
 We are not persuaded, therefore, that the legislature did not intend to require LIGA to pay the legal rate of interest, even if to do so would cause its liability to exceed the statutory cap. Further, we believe that Aramburo is based upon a sound understanding of both the LIGA statutes and the purposes underlying those statutes. Consequently, we adopt both the reasoning and the holding of Aramburo and conclude that LIGA may be required to pay interest at the legal rate, even if to do so would cause its liability to exceed the $149,900 statutory cap.
 
 
 77
 In reaching this conclusion, however, we specifically reject the claimants' broader contention that LIGA may also be required to pay all interest due upon the amount of a judgment that exceeds the cap. A contrary holding, to take an extreme example, could, in the case of a large assessment of worker's compensation damages, result in annual interest charges that themselves exceed the cap. Persuaded that the legislature could not have intended such a result, we hold that LIGA is liable only for interest on that portion of the underlying judgment for which it can be held statutorily liable.
 
 V.
 
 78
 Recovery of Attorneys' Fees from LIGA.
 
 
 79
 We now turn to the question of whether LIGA is obligated to pay attorneys' fees and costs incurred by an insured in successfully prosecuting a claim against LIGA for coverage under a policy of insurance issued by an insolvent member. Claimants contend that LIGA is liable for attorneys' fees incurred in successfully litigating these claims.
 
 
 80
 In Deshotels, we determined that LIGA can be held liable for attorneys' fees and costs incurred in successfully prosecuting a claim against it if LIGA acted in bad faith in denying a claim.[53] In this appeal, LIGA maintains that we decided that issue improperly. LIGA contends that a worker's compensation statute which we cited in support of our decision in Deshotels[54] and section 22:658,[55] a general insurance statute providing for attorneys' fees, are inapplicable to it.
 
 
 81
 LIGA advances two arguments. First, it asserts that these provisions apply only to policy coverage questions. According to LIGA, issues regarding its coverage are, instead, statutory coverage questions. Second, LIGA argues that because these statutes were enacted before the LIGA statutes, they were not intended to apply to LIGA. We find neither argument to be persuasive.
 
 
 82
 The distinction between policy coverage and statutory coverage is, at best, strained. In effect, the statutory coverage becomes the policy coverage upon the insolvency of the insurer. At that time, the association is "deemed the insured" and takes on all the rights and obligations of the insurer,[56] including the obligation to deal with insureds in good faith. Therefore, the provisions of sections 23:1201.2 and 22:658 do apply to coverage questions.
 
 
 83
 LIGA's argument that these sections are inapplicable because they pre-date LIGA is equally without merit. On the contrary, it is reasonable to assume that the legislature, in enacting LIGA, was aware of the existence of these statutes. Therefore, absent some affirmative statement that they do not apply to LIGA, we assume that the legislature intended that they do apply. In addition, the same policy considerations that support our holding that LIGA may be required to pay postjudgment interest apply with equal force to this issue.
 
 
 84
 That LIGA may be required to pay attorneys' fees does not, of course, mean that fees should be awarded automatically in these cases. Under these statutes, attorneys' fees may be awarded only if the defendant acted arbitrarily, capriciously, or without probable cause. As we noted in Deshotels, this is an "essentially factual question."[57] In Deshotels, LIGA failed to object to the request for attorneys' fees. The award of fees as to that case, therefore, must be upheld. In the remaining cases, the district courts should determine whether LIGA had sufficient good-faith reasons to deny coverage.
 
 VI.
 
 85
 LIGA's Obligation To Pay Pre-Insolvency Attorneys' Fees.
 
 
 86
 This issue presented here is relatively straightforward: Is LIGA obligated to pay attorneys' fees and costs incurred incident to an insured's defense, and which accrue before the insolvency of a member-insurer of LIGA, for services rendered in defense of a claim covered by LIGA? Sea-lift, for example, asserts that LIGA owes it attorneys' fees and costs expended in defending the suit brought by a claimant--irrespective of whether these attorneys' fees were expended before the insurer's bankruptcy. Since Sealift was a policyholder to whom its insurer owed a duty of defense and indemnity, Sealift claims that it is a policyholder asserting a covered claim for its attorneys' fees against LIGA, for purposes of sections 22:1376 and 1379.[58]
 
 
 87
 Sealift correctly asserts that LIGA's statutory obligation is coextensive with that of the insolvent insurer.[59] Hence, to the extent that Sealift, as the insured, incurred attorneys' fees prior to the insurer's bankruptcy, LIGA should be liable for those fees. However, it does not necessarily follow that the insurer's legal fees are recoverable from LIGA.
 
 
 88
 The challenge presented by this issue is in understanding that Sealift was not the party that incurred recoverable legal fees. As LIGA correctly notes, these pre-insolvency fees were incurred not by Sealift but by the law firm of Abbott, Webb, Best & Meeks ("the Abbott firm"), which performed Transit's defense work. Sealift was merely the third-party beneficiary of the Abbott firm's contract with Transit to provide general defense services.
 
 
 89
 Thus, as LIGA claims, this suit for fees arises out of the contract between Transit and the Abbott firm, not out of a "covered claim" by Sealift brought against the insurer; in other words, this action is based upon a debt which Transit owes to its lawyers and, hence, LIGA should not be responsible. LIGA cites several state court decisions holding that a law firm stands as a "general creditor" of the insolvent insurer rather than as a "claimant" under insurance statutes.[60] Further, LIGA argues, the Abbott firm, the real party in interest here, is neither a claimant nor a policyholder.
 
 
 90
 Although the defense services were rendered in connection with a claim made by Sealift as a policyholder, the claim for fees asserted here arose out of, and were incurred pursuant to, the Transit-Abbott contract. LIGA's statutory duty to pay the claims and expenses of insureds does not extend under the IGAL to the bills from law firms that were under contract with the insolvent insurer but not the insured.[61]
 
 
 91
 Holding as we do that the disputed attorneys' fees arose out of the contract with the bankrupt insurer rather than constituting a covered claim, it also follows that LIGA is not liable for fees and costs incurred after Transit became insolvent. Moreover, since we have concluded, supra, that P & I policies constitute nonrecoverable ocean marine insurance, LIGA cannot, in the interests of consistency, be liable for legal services rendered in defense of such P & I claims.
 
 
 92
 Accordingly, to the extent that there is no contractual relationship between the firms now claiming fees and the insureds--or to the extent that the legal services are traceable to P & I claims--the district court erred in holding LIGA responsible for the payment of pre-insolvency and post-insolvency legal fees incurred by the insolvent insurers.[62] The law firms must thus join the queue, however long, with the other creditors of the bankrupt insurance companies.[63]
 
 VII.
 
 93
 Drop-Down Coverage.
 
 
 94
 The last remaining issue that we must address affects one case in particular. In Sifers, the employer, General Marine Catering Co. (General Marine), carried a WC/EL policy underwritten by Transit and an excess, or umbrella, policy from First State Insurance Co. (First State). Since Transit is now insolvent, General Marine's umbrella insurer is potentially at risk.
 
 
 95
 Sifers injured his back and Transit, pursuant to its WC/EL obligations, paid maintenance and cure until it became insolvent in December 1985. Thereafter, the employer, General Marine, entered into a $215,000 settlement with Sifers and prosecuted a third-party complaint against LIGA and, alternatively, First State for indemnification. The question presented here is the following: Does the excess insurance purchased from First State by the employer "drop down" to provide primary insurance coverage as a result of the primary insurer's insolvency?
 
 
 96
 We have held, supra, that an WC/EL policy does not fall within the "ocean marine insurance" exception for LIGA coverage. Accordingly, LIGA must assume liability for the Sifer's WC/EL settlement unless the excess insurance policy from First State "drops down" and provides coverage which LIGA would otherwise have to assume. Not surprisingly, LIGA argues that First State's umbrella policy drops down to provide primary coverage and that it is not at risk. General Marine, the employer, also argues that the excess policy "drops down," presumably reasoning that full recovery for the Sifer's settlement will be easier to attain against First State.
 
 
 97
 General Marine and First State dispute the operative effect of certain provisions of the umbrella policy that are dispositive of this issue. Item 3 of the policy, for example, states the following:
 
 
 98
 Limits of Liability: The limit of the Company's liability shall be as stated herein, subject to all the terms of this policy having reference thereto.
 
 
 99
 1. $10,000,000 Single limit any one OCCURRENCE combined PERSONAL INJURY, PROPERTY DAMAGE and ADVERTISING INJURY or DAMAGE in excess of:
 
 
 100
 A. The amount recoverable under the underlying insurance as set out in Schedule A attached or
 
 
 101
 B. $10,000 Ultimate net loss as the result of one occurrence not covered by said underlying insurance.
 
 
 102
 General Marine argues first that the policy is an umbrella policy rather than a strict excess policy and, hence, is intended to provide primary coverage in the circumstances presented here. Second, General Marine points to the policy language cited above that provides that First State's coverage shall begin at the level of the "amount recoverable" from any underlying policies.
 
 
 103
 We have interpreted the term "recoverable" to mean the amount actually recoverable from the underlying policies. In Mission Nat'l Ins. Co. v. Duke Transp. Co., we found that under Louisiana law, "[w]hen an excess insurer uses the term 'collectible' or 'recoverable' it is agreeing to 'drop down' in the event that the primary coverage becomes uncollectible or unrecoverable"[64]; we concluded that the language in the policy at issue, "other valid and collectible insurance," provided drop-down coverage when the primary insurer became insolvent.[65] Hence, our caselaw dictates that "recoverable" does not even fall within the category of ambiguous terms; its meaning is fixed in favor of the insured. Thus, as General Marine suggests, First State's coverage begins at "dollar one," absent some other provision of the policy designed to change this natural consequence.
 
 
 104
 First State's response to its predicament is not to challenge the interpretation given to the term "recoverable," but to claim that the language in the first paragraph of item 3 requires that we look to other provisions in the policy to determine when coverage begins; we are reminded that item 3 states as well, "The limit of the Company's liability shall be as stated herein, subject to all the terms of this policy having reference thereto." First State latches onto the phrase "subject to all the terms of this policy having reference thereto" with the understanding that the limits on liability are subject to all the other provisions in the policy. Thus, First State concludes, the policy must be read as a whole, and to the extent possible, a "harmonic construction" of the policy must be applied.[66]
 
 
 105
 First State claims that several provisions of the policy compel the following "harmonic construction": that the policy only applies to claims in excess of $500,000. Section II of the policy, for example, provides that First State's liability is limited to the ultimate net loss in excess of the insured's "underlying limit," defined as that
 
 
 106
 amount equal to the limits of liability indicated beside the underlying insurance listed in Schedule A of underlying insurance ($500,000), plus the applicable limits of any other underlying insurance collectible by the INSURED....
 
 
 107
 We recently have held that the above language is amenable to only one reasonable interpretation: The scheduled (or listed) underlying insurance need not be collectible or recoverable, only the non-scheduled insurance must be so, in order to be considered part of the "underlying limit."[67] Second, First State cites the policy's definition of "ultimate net loss" that excludes "costs and expenses which an underlying insurer has paid or incurred or is obligated to pay to or on behalf of the insured" (emphasis added). Thus, First State argues that although General Marine may not be able to recover its losses from Transit, that does not eliminate Transit's obligation to pay those losses. Hence, the ultimate net loss which First State must cover for General Marine excludes the amount owed from Transit to General Marine. Since the Sifer's settlement amount was well within Transit's $500,000 WC/EL policy limit, First State argues that it owes General Marine nothing.
 
 
 108
 First State also relies upon our opinion in Continental Marble & Granite v. Canal Ins. Co.,[68] holding that the following policy language did not cause the excess policy to drop down:
 
 
 109
 The company shall be liable only for ultimate net loss resulting from any one occurrence in excess of [the stated amount;] if the insurance afforded by such underlying insurance is inapplicable to the occurrence, [then] the amount stated in the declarations as the retained limit.[69]
 
 
 110
 In that case, Continental Marble argued that the insolvency of its primary insurer rendered that insurer's coverage "inapplicable," thus exposing its excess insurer to full coverage. We held there that "inapplicable" was not ambiguous: Insurance is not inapplicable merely because the insurer is insolvent. We noted the difference between "inapplicable" and the phrase "other valid and collectible insurance,"[70] which the Louisiana appellate courts have held does expose an excess insurer to liability if all that is available is an insolvent-insurer's policy.[71] Further, we refused to interpret "inapplicable" in such a broad fashion because to do so would, "in effect, transmogrify the policy into one guaranteeing the solvency of whatever primary insurer the insured might choose."[72]
 
 
 111
 The flaw in First State's separate attempts to find an "escape" is that all of the additional provisions it points to in its policy are inconsistent with the controlling provision--the provision establishing the limit of its liability as the excess of the "amount recoverable" from the underlying insurance. Moreover, the caselaw upon which it relies is distinguishable. Thus, even though provisions exist that speak to the "scheduled underlying insurance" or "applicable underlying insurance," these provisions are at odds with the fundamental protection bargained for in the policy. First State agreed to be liable for losses incurred above the amounts recoverable from other scheduled policies. Under Louisiana law, when two provisions of a policy conflict and thereby create some ambiguity as to the meaning of the provision in question, that ambiguity is to be resolved in favor of the insured.[73]
 
 
 112
 In addition, the policy concern present in Continental Marble, that insurance companies should not have to scrutinize one another's financial wellbeing, is not present here. There is no avoiding the fact that First State has issued an umbrella policy, which by its terms "drops down" in some instances, applicable here, to provide primary protection to the insured if other insurance is uncollectible. Hence, the drafter of an umbrella policy must be especially careful to protect against "dropping down" where "dollar one" coverage is not intended to be provided as reflected in the premiums charged. That care was not taken here, and First State's attempts to finesse a more favorable interpretation are not persuasive.
 
 
 113
 Accordingly, since the district court concluded that First State's policy did not drop down, we reverse on the ground that the clear language of the policy creates drop-down coverage. LIGA is not at risk for the $215,000 WC/EL settlement in favor of the claimant, or for the related expenses of maintenance and cure and attorneys' fees, since First State provides ample primary coverage.
 
 
 114
 Conclusion.
 
 
 115
 Having addressed all issues briefed and argued before this court, we REMAND the cases to the various district courts from which the separate litigations arose for further proceedings consistent herewith.
 
 
 
 [1]
 The separate cases, arising from the Eastern and Western Districts of Louisiana, are consolidated for purposes of this appeal and are styled as follows: Allied Towing Servs., Inc. v. LIGA, No. 86-3685; Blair v. Sealift, Inc., No. 86-3760; Cox v. Magnum Marine, No. 89-4046; Deshotels v. SHRM Catering Servs., No. 87-4798; Dominick v. Houtech Inland Well Serv., Inc., No. 89-3453; Duplantis v. Galuszka, No. 88-3308; Green v. Supreme Marine Mgmt., Inc., No. 87-4387; Lafayette Crewboats, Inc. v. LIGA, No. 87-3164; Naples v. G & H Boat Rentals & Marine Serv., Inc., No. 87-3606; Reed v. SHRM Catering Servs., Inc., No. 89-4671; Sifers v. General Marine Catering Co., No. 86-3494
 
 
 [2]
 46 U.S.C.App. § 688
 
 
 [3]
 For a more complete factual summary, see Deshotels v. SHRM Catering Servs., Inc., 842 F.2d 116 (5th Cir.) and 845 F.2d 582 (5th Cir.1988)
 
 
 [4]
 "Does this claim for maritime-related injuries, brought on the Standard Workmen's Compensation and Employers' Liability policy with a marine endorsement, involve 'ocean marine insurance' so as to be excluded, by virtue of La.R.S. 22:1377, from the coverage of the Insurance Guaranty Association Fund?"
 Id., 845 F.2d at 585.
 
 
 [5]
 See id., 538 So.2d 988 (La.1989)
 
 
 [6]
 549 So.2d 283 (La.1989)
 
 
 [7]
 Boudreaux v. Cardinal Wireline Specialties, Inc., Nos. 86-3811, 87-3099, has been settled since this consolidated appeal first came before us. Dominick v. Houtech Inland Well Serv., Inc., No. 89-3453, and Reed v. SHRM Catering Servs., Inc., No. 89-4671, have been added
 
 
 [8]
 Since these separate cases involve the district courts' interpretation of the "ocean marine insurance" exception, other statutory provisions, and policy language, the appropriate standard of review is de novo as to all issues raised here. See, e.g., Jones v. Southern Marine & Aviation Underwriters, Inc., 888 F.2d 358, 360 (5th Cir.1989)
 
 
 [9]
 La.Rev.Stat.Ann. § 22:1375 (West 1978 & Supp.1989)
 
 
 [10]
 Id. § 22:1377
 
 
 [11]
 549 So.2d at 284
 
 
 [12]
 La.Rev.Stat.Ann. § 22:6(13) (West 1978 & Supp.1989)
 
 
 [13]
 Id. § 22:6(13)(e)
 
 
 [14]
 La.Civ.Code Ann. art. 11 (West Supp.1989)
 
 
 [15]
 549 So.2d at 289
 
 
 [16]
 Id. at 290 (emphasis added)
 
 
 [17]
 Id. at 289
 
 
 [18]
 La.Rev.Stat.Ann. § 22:6(13)(e) (West 1978) (emphasis added)
 
 
 [19]
 See W. Rodda, Marine Insurance: Ocean and Inland 58-59 (1970); A. Brunk, V. Simone & C. Williams, Ocean Marine Insurance 1, 4 (1988); D. Bickelhaupt, General Insurance 542 (10th ed. 1979); G. Gilmore & C. Black, The Law of Admiralty 76 (2d ed. 1975); Wright, "Liabilities (1) Arising Out of Collision with Another Vessel and Not Covered by the Hull Policy, (2) for Damage to Another Vessel or Her Cargo, Not Caused by Collision with the Insured Vessel, (3) for Damage to Any Object or Property Except Another Vessel or Her Cargo," 43 Tul.L.Rev. 576, 576-80 (1969)
 
 
 [20]
 Act of July 6, 1989, No. 618, 1989 La.Sess.L.Serv. 1354, (West) (to be codified at La.Rev.Stat. 22:1377); Act of July 7, 1989, No. 688, 1989 La.Sess.L.Serv. 1449, (West) (to be codified at La.Rev.Stat. 22:1379)
 
 
 [21]
 538 So.2d at 993
 
 
 [22]
 See Hopkins v. Lockheed Aircraft Corp., 394 F.2d 656, 657 (5th Cir.1968); National Educ. Ass'n v. Lee County Bd. of Pub. Instruction, 467 F.2d 447, 450 n. 6 (5th Cir.1972); Redgrave v. Boston Symphony Orchestra, 855 F.2d 888, 903 (1st Cir.1988); 17A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4248, at 179 (2d ed. 1988)
 
 
 [23]
 See generally Boyd v. Bowman, 455 F.2d 927, 928 (5th Cir.1972) (per curiam); Tarr v. Manchester Ins. Corp., 544 F.2d 14, 14-15 (1st Cir.1976) (per curiam)
 
 
 [24]
 WC/EL Policy, Amendments to Coverage B Endorsement--Maritime, p 4, reprinted in Addendum to LIGA's Brief on Issue No. 2, at 000008
 
 
 [25]
 P & I Policy, lines 103-05, reprinted in Addendum to LIGA's Brief on Issue No. 2, at 000026
 
 
 [26]
 Gros v. Houston Fire & Casualty Ins. Co., 195 So.2d 674 (La.App. 1st Cir.1967); Beauregard v. Salmon, 205 So.2d 634 (La.App. 2d Cir.), on rehearing, 205 So.2d 641 (La.App. 2d Cir.1967)
 
 
 [27]
 Boudreaux v. Shannon Marine, Inc., 875 F.2d 511 (5th Cir.1989)
 
 
 [28]
 549 So.2d at 287
 
 
 [29]
 214 So.2d 116 (La.1968)
 
 
 [30]
 Id. at 118
 
 
 [31]
 Id
 
 
 [32]
 789 F.2d 300 (5th Cir.1986)
 
 
 [33]
 200 So.2d 67 (La.App. 1st Cir.1967), aff'd, 214 So.2d 116 (La.1968)
 
 
 [34]
 214 So.2d at 118
 
 
 [35]
 200 So.2d at 77-78
 
 
 [36]
 Consider the clause in the P & I policy. It declares that the P & I policy does not cover the risk if another policy does. The WC/EL policy might be such a policy, but according to its exclusion clause, it does not cover the risk if a P & I policy does. Unfortunately, under the terms of the "other insurance" clause in the P & I policy, one cannot determine whether that policy covers the risk without first determining whether another policy, such as the WC/EL policy, does. The same result obtains if the interpreter begins with the clause in the WC/EL policy. It declares that the WC/EL policy does not cover the risk if a P & I policy does. The P & I policy might cover the risk, but its other insurance clause provides that it will not, if another policy does. The WC/EL policy might be such a policy, but according to its exclusion clause it does not cover the risk if a P & I policy does. The clauses in issue therefore are irreconcilable and fall within the scope of the Graves rule
 
 
 [37]
 549 So.2d at 286-87
 
 
 [38]
 Id. at 287
 
 
 [39]
 See La.Rev.Stat.Ann. § 22:1382(1)(a) (West Supp.1989)
 
 
 [40]
 Id. (emphasis added)
 
 
 [41]
 538 So.2d at 993 (emphasis added)
 
 
 [42]
 See La.Rev.Stat.Ann. §§ 22:6(4) and 22:6(5)
 
 
 [43]
 See 7B J. Appleman, Insurance Law & Practice § 4571, at 1 (Berdal ed. 1979). This treatise notes that "workers' compensation is routinely written in combination with an employer's liability policy to provide protection ... where worker's compensation may not apply...." Id. at 2 (emphasis added)
 
 
 [44]
 438 So.2d 274 (La.App. 4th Cir.), writ denied, 443 So.2d 1110 (La.1983)
 
 
 [45]
 Id. at 276
 
 
 [46]
 Burrell v. Newsome, 883 F.2d 416, 421 (5th Cir.1989) (quoting Mott v. Mitsubishi Int'l Corp., 636 F.2d 1073, 1074 (5th Cir. Unit A Feb.1981)). Accord Exxon Co., U.S.A. v. Banque de Paris et des Paysbas, 889 F.2d 674, 675 (5th Cir.1989) (quoting West v. American Tel. & Tel. Co., 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940))
 
 
 [47]
 Barham, "The Importance of Writ Denial," 21 Loyola L.Rev. 835, 836 (1975)
 
 
 [48]
 These statutes provide,
 (1) The association shall:
 (a) Be obligated to the extent of the covered claims existing prior to the determination [or under other specified time limits] ..., but such obligation shall include only that amount of each covered claim ... which is in excess of one hundred dollars and is less than [one hundred] fifty thousand dollars....
 (b) Be deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties and obligations of the insolvent insurer as if the insurer had not become insolvent.
 La.Rev.Stat.Ann. § 22:1382(1)(a), (b) (bracketed matter supplied).
 This part shall be liberally construed to effect the purpose under Section R.S. 22:1376, which shall constitute an aid and guide to interpretation.
 Id. § 22:1378.
 The purpose of this Part is to provide a mechanism for payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policy holders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the costs of such protection among insurers.
 Id. § 22:1376.
 
 
 [49]
 438 So.2d at 276
 
 
 [50]
 Id. (emphasis added)
 
 
 [51]
 Id
 
 
 [52]
 See Medical Malpractice Act, La.Rev.Stat.Ann. § 40:1299.42 (West 1977 & Supp.1989) (limitation of recovery)
 
 
 [53]
 842 F.2d at 120
 
 
 [54]
 Id. n. 17. See La.Rev.Stat.Ann. § 23:1201.2 (West Supp.1989), which provides, in pertinent part,
 Any insurer liable for claims arising under [the worker's compensation chapter] ... shall pay the amount of any claim due ... within sixty days.... Failure to make such payment ..., when such failure is found to be arbitrary, capricious, or without probable cause, shall subject ... insurer ... to payment of all reasonable attorney's fees for the prosecution and collection of such claim....
 
 
 [55]
 La.Rev.Stat.Ann. § 22:658 (West Supp.1989) provides, in pertinent part,
 B. (1) Failure to make such payment [due an insured] within sixty days ..., when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, ... together with all reasonable attorney fees for the prosecution and collection of such loss....
 
 
 [56]
 See La.Rev.Stat.Ann. § 22:1382(1)(b) (West 1978)
 
 
 [57]
 842 F.2d at 120
 
 
 [58]
 For the relevant portion of § 22:1376, see supra note 48
 Moreover, La.Rev.Stat.Ann. § 22:1379 (West Supp.1989) defines "covered claim" as
 an unpaid claim ... which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this Part applies issued by an insurer, if such insurer becomes an insolvent insurer....
 
 
 [59]
 See La.Rev.Stat.Ann. § 22:1382(1)(b)
 
 
 [60]
 See White v. Alaska Ins. Guar. Ass'n, 592 P.2d 367 (Alaska 1979); Maguire, Ward, Maguire & Eldredge v. Idaho Ins. Guar. Ass'n, 730 P.2d 1086 (Idaho App.1986); Metry, Metry, Sanom & Ashare v. Michigan Property & Casualty Guar. Ass'n, 267 N.W.2d 695 (Mich.1978); Ohio Ins. Guar. Ass'n v. Simpson, 439 N.E.2d 1257 (Ohio App.1981)
 
 
 [61]
 The Abbott firm's supplemental brief argues that the legislature would have excluded pre-insolvency attorneys' fees incurred by insureds if it had so intended; the firm points to a Texas statute that does exclude such fees. Even if we were to accept that kind of questionable inference regarding legislative intent based upon the absence of an exception, it in no way weakens LIGA's argument that the legislature only meant for LIGA to cover claims made by insureds, not service providers to the insurance companies
 
 
 [62]
 It is important to note here that LIGA evidently failed to preserve, for purposes of appeal, the issue of the award of fees which the district court made to SHRM Catering Services in the Deshotels action. Consequently, LIGA waived any challenge to the award of attorneys' fees as to that case
 
 
 [63]
 It is, however, possible to contemplate situations in which LIGA would be responsible for pre-insolvency fees because of a contractual obligation to defend between the insured, not the insurer, and the law firm. Recovery of such fees may also arise where the insurer, in bad faith, fails to defend and the insured must retain separate counsel
 
 
 [64]
 792 F.2d 550, 553 (5th Cir.1986)
 
 
 [65]
 See also Reserve Ins. Co. v. Pisciotta, 30 Cal.3d 800, 180 Cal.Rptr. 628, 631-33, 640 P.2d 764, 767-69 (1982); Donald B. MacNeal, Inc. v. Interstate Fire & Casualty Co., 132 Ill.App.3d 564, 87 Ill.Dec. 794, 796, 477 N.E.2d 1322, 1324 (1985)
 
 
 [66]
 See Insurance Co. of N. Am. v. John J. Bordlee Contractors, Inc., 543 F.Supp. 597, 602 (E.D.La.1982), aff'd, 733 F.2d 1161 (5th Cir.1984)
 
 
 [67]
 See Transco Exploration Co. v. Pacific Employers Ins. Co., 869 F.2d 862, 864 (5th Cir.1989)
 
 
 [68]
 785 F.2d 1258 (5th Cir.1986)
 
 
 [69]
 Id. at 1259 (emphasis added)
 
 
 [70]
 Id
 
 
 [71]
 See Gros v. Houston Fire & Casualty Ins. Co., 195 So.2d 674, 676-77 (La.App.), writ ref'd, 250 La. 644, 197 So.2d 898 (1967)
 
 
 [72]
 Continental Marble, 785 F.2d at 1259
 
 
 [73]
 See Credeur v. Luke, 368 So.2d 1030, 1032 (La.1979)